764 So.2d 274 (2000)
Rosalie FLEMING
v.
AMERICAN AUTOMOBILE ASSOCIATION, INC., Group Voyagers, Inc., Peggy Phillips, The Continental Insurance Company and Trip Mate Insurance Agency, Inc.
No. 99-CA-1638.
Court of Appeal of Louisiana, Fourth Circuit.
June 21, 2000.
Rehearing Denied July 17, 2000.
*276 W. Richard House, Jr., Marguerite K. Kingsmill, House, Kingsmill & Riess, L.L.C., New Orleans, Louisiana, Attorneys for Plaintiff/Appellee.
Howard Daigle, Jr., Michael D. Fisse, Seal Daigle & Ross, Covington, Louisiana, G. Bruce Parkerson, Plauche' Maselli Landry & Parkerson L.L.P., New Orleans, Louisiana, Martin E. Golden, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, Louisiana, Attorneys for Defendants/Appellants.
(Court composed of Chief Judge ROBERT J. KLEES, Judge MIRIAM G. WALTZER, Judge JAMES F. McKAY, III).
McKAY, Judge.
The defendants, Group Voyagers Inc., Trip Mate Insurance Agency Inc., Monumental *277 Life Insurance Co., and MEDEX Assistance Corporation, appeal from the trial court's judgment finding them jointly, severally and solidarily liable in the amount of $1,137,596.90 and finding in favor of the plaintiff Rosalie Fleming.
The plaintiff, on April 30, 1992, purchased a package tour of Greece from American Automobile Association Inc. (AAA) through its travel agent Ms. Peggy Phillips. For an additional $59.00 paid to AAA, a travel insurance policy was added to the travel package.
The travel insurance had two distinct areas of coverage, assorted travel benefits such as trip interruption/cancellation and lost luggage and medical emergency assistance. In addition to accidental death and dismemberment coverage, the policy provided medical coverage including a medical expense benefit with a limit of $10,000. However, the medical expense benefit was in excess of any other valid health coverage. The medical coverage also provided an emergency medical evacuation benefit with a separate $15,000 limit. The travel policy further provided a trip cancellation and interruption benefit with a limit of $10,000, which reimbursed the insured for costs of tours, hotels, etc., in the event the trip was interrupted or cancelled due to the insured's sickness, injury or other unforeseen circumstances. Finally, the policy provided various other benefits such as trip delay, and baggage delay. The travel insurance was underwritten by Monumental Life Insurance Co., administered by Trip Mate Insurance Agency and sold through Globus-Gateway (Group Voyagers, Inc.); Monumental Life Insurance Co., contracted with MEDEX to provide the medical assistance; Trip Mate contracted with Group Voyagers to sell and administer travel insurance to tour participants; Group Voyagers is a wholesale tour provider who packaged the Classical Greece tour and sold it to AAA. Monumental also had a contract with Trip Mate as their underwriter. All of the defendants shared in the $59.00 premium except AAA, who received a commission for the sale of the travel policy.
On October 6, 1992, the plaintiff fell and fractured her right hip while at Delphi in Greece.[1] Ms. Phillips, the travel director, found the Globus/Gateway pamphlet, which outline the plaintiff's benefits in the plaintiff's luggage. Ms. Phillips, on behalf of Ms. Fleming, contacted the MEDEX representative who secured medical assistance and transportation from Delphi's Amfissa Clinic to Hygeia Hospital in Athens. After arriving at Hygeia Hospital, the plaintiff selected a physician, Dr. Milton Radopoulos[2], from the list of physicians that MEDEX provided to the plaintiff. She accepted the physician's advice and underwent a surgical implantation of a prosthetic hip. The recommendation for surgery was based on the plaintiff's advanced stage osteoporosis. Through communications with Dr. Yetton,[3] MEDEX's medical advisor who reviewed all medical requests made to MEDEX and advised MEDEX as to their appropriateness, and Dr. Radopoulos, the surgery was approved. On October 17, 1992, eight days after surgery, the plaintiff left Athens hospital *278 for New Orleans.[4] Hygeia Hospital and Dr. Radopoulos made arrangements for the transportation by ambulance from the hospital to the airport. When the plaintiff arrived at the airport, hospital employees transported her from a gurney to a wheelchair. She remained in a sitting up position for over two hours before she boarded the plane. Ms. Fleming was seated in a business class seat as was Ms. Phillips who was listed as her travel escort in case Ms. Fleming needed any assistance during the flight. There is some dispute in the record whether Dr. Radopoulos communicated to Dr. Yetton that the plaintiff was to be placed in two business seats to enable her to remain in a reclined position.
During the flight the plaintiff experienced severe pain, which was later discovered to be from a hip dislocation. The dislocation allegedly occurred while the plaintiff was seated upright in the wheelchair at Athens airport.[5]
Ms. Fleming made her own transportation arrangements from the New Orleans airport to her home. On Sunday October 18, 1992, she was admitted to Jo Ellen Smith Hospital and was examined by Dr. Earl Rozas.[6] She was referred to an orthopedic surgeon at Hotel Dieu Hospital, Dr. Robert D'Ambrosia. On Monday she was transported by ambulance to Hotel Dieu Hospital. The plaintiff ultimately underwent three surgical procedures to correct the problems with her hip implantation dislocation. The first attempt, on October 20, 1992, was a closed reduction under general anesthesia resulted in cardiac arrest. When she was stabilized, an attempted second closed reduction on October 30 failed. Finally, on November 12, 1992, Dr. D'Ambrosia performed a second hip replacement which was successful. However, Ms. Fleming still required significant rehabilitation. Clearly, the plaintiff suffered endless trouble with the hip implantation performed by the Greek physicians, which was ultimately corrected through a completely new hip replacement.[7]
The dispute, which is the subject of this appeal, arises over the coordination and management of plaintiff's evacuation from Greece to the United States as part of the travel insurance plan.

STANDARD OF REVIEW
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) writ denied 374 So.2d 660 (La. 1979); Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id. at 883. The issue to be resolved by the reviewing *279 court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. at 882. The reviewing court may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in light of the record in its entirety even though it feels its evaluations are more reasonable. Id. The Louisiana Supreme Court has also recognized that "[t]he reason for this well-settled principal of review is based not only upon the trial court's better capacity to evaluate live witnesses as compared with the appellate court's access only to a cold record, but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

DEFENDANT'S ASSIGNMENTS OF ERROR

ASSIGNMENT I:
The defendants argue that trial court erred in holding the defendants liable for a breach of duty to plaintiff.
An insurance contract is governed by the general rules of contract; the underlying duty of the parties to each other in performance of the contract is controlled by the Louisiana Civil Code. Civil Code Article 1983 provides:
Contracts have the effect of law for the parties and may be dissolved through the consent of parties or on the grounds provided by law. Contracts must be performed in good faith.
In interpreting contracts, we are guided by the general rules contained in La. C.C. arts 2045-2057. Subject to the limits imposed by law, parties are free to contract as they choose. Zeigler v. Pleasant Manor Nursing Home, 600 So.2d 819, 822 (La.App. 3 Cir.1992). The cardinal rule, as set forth in La. C.C. art.2045, is that the interpretation of a contract is the determination of the common intent of the parties. Amend v. McCabe, 95-0316, p. 7 (La.12/1/95); 664 So.2d 1183, 1187; McCrory v. Terminix Service Co. Inc., 609 So.2d 883, 885 (La.App. 4 Cir.1992). When they are clear and explicit, no further interpretation may be made in search of the parties' intent. Amend at 1187; McCrory at 885.
The parties in this matter chose to contract with each other. The defendants' specific obligations to the plaintiff are governed by the terms of the travel insurance policy. The plaintiff's specific obligation was to pay the premium to the defendants. In the instant matter the defendants chose to provide some benefits of the travel insurance policy through contractual arrangements with each other and the plaintiff. The administrator of the policy was Trip Mate Insurance Agency. Monumental Life Insurance Company acted in its capacity as the underwriter. Group Voyagers was self-funded for the other benefits. Finally, MEDEX Assistance Corporation was the hands on provider for medical services. All shared the $59.00 premium. The terms of the policy included that the plaintiff was to receive peace of mind among other benefits, which included a reimbursement within the limits of the policy for $10,000 in medical assistance, $15,000 for medical evacuation and $10,000 for trip cancellation.
MEDEX, in their faulty deployment of the plaintiff's medical evacuation, failed to honor the terms of the contract. This was precipitated by the miscommunications with Hygeia Hospital and Dr. Radopoulos, and resulted in the plaintiff suffering a hip dislocation of the recent hip replacement. MEDEX's actions were not performed in bad faith. Nonetheless, the contract conditions were not fulfilled causing the breach of duty on the part of the defendants. This assignment is without merit.

*280 ASSIGNMENT II:
The defendants next argue that trial court erred in holding the defendants Monumental Life Insurance Co., MEDEX, Trip Mate Insurance Agency and Group Voyagers, solidarily liable for plaintiff's general and special damages.
The trial court collectively refers to the defendants as one because they shared in the premium. Defendants, at one point or another, acted as insurance agents or brokers or underwriters or providers of services soliciting applications for policies of insurance, aiding and placing risks or effecting insurance and deriving substantial compensation and commissions from the premium. This joint enterprise of the defendants renders them liable for the acts or omissions in the Athens airport and on the return flight that caused Ms. Fleming's significant damages. No matter where the individual defendants point fingers, the evidence shows that they all, for a fee, assumed the responsibility of honoring the contract/Travel Insurance Policy toward the ultimate goal of selling the entire travel package to the plaintiff. It is difficult to discern what role each individual defendant played in this entrepreneurial scheme. All were intricately involved in marketing, soliciting the policy, selling, arranging for the underwriting, drafting, and administering the insurance policies, collecting the premiums, and providing the benefits to the plaintiff. They are all clearly under the purview of La. R.S. 22:1212 and fall into the definition of "insurer". The trial court reasoned that since "they all shared in the premium dollars-all had an obligation to plaintiff and are all equally at fault." We agree.
La. C.C. art. 1797 provides that an obligation may be solidary though it derives from a different source for each obligor. In Hoefly v. Government Employees Insurance Company, 418 So.2d 575 (La. 1982), the Louisiana Supreme Court held that an obligation is solidary among debtors when they are obligated to the same thing, so that each may be compelled for the whole, and payment by one exonerates the other toward the creditor. Hoefly, at 576. Differing sources of liability do not preclude an in solido obligation; the obligation may be in solido even though the obligations of the obligors arise from separate acts or by differing reasons. It is the co-extensiveness of the obligations for the same debt, not the source of liability that determines the solidarity of the obligation. James v. Formosa Plastics Corporation of Louisiana, 951794 (La.App. 1 Cir. 4/4/96); 672 So.2d 319, writ denied 96-1091 (La.11/22/96); 683 So.2d 285; Stonecipher v. Mitchell, 26,575 (La.App. 2 Cir. 5/10/95); 655 So.2d 1381.
In the case sub judice, the underlying obligation is coextensive because each of the defendants shared a premium. Regardless of how insignificant their percentage of the $59.00 premium, they were all parties to the contract for travel insurance with Ms. Fleming. They were all parties to interconnecting contracts for the entire travel package. Although their reasons for a share in the premium may be different, all shared in the profits from its sale and, in some capacity, although under different theories of liability, acted in concert and are clearly solidarily liable to the plaintiff for her injuries. Accordingly, we find no merit to this assignment of error.

ASSIGNMENT III:
The defendants argue that trial court erred in his quantification of special damages and general damage award to plaintiff.
Specifically they argue that the trial court erred in awarding the plaintiff $1,000,000.00 in general damages for the injuries she sustained as a result of the defendants actions.

GENERAL DAMAGES
The standard for appellate review of general damages awards is difficult to express as it is necessarily non-specific, and the requirement of an articulated basis *281 for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is "great" and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).
In order to determine whether the general damages award shocks the conscience, the court should look to the individual circumstances of the case. In Re Medical Review Panel Bilello, 621 So.2d 6, 10 (La.App. 4 Cir.1993), writ denied, 629 So.2d 1139. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991).
The trial court was well within its discretion to award $1,000,000.00. It in no way shocks the conscience. The plaintiff's reliance on, and purpose in purchasing the travel policy, was grounded in both intellectual enjoyment/piece of mind, and monetary benefits, should her trip be interrupted or should she encounter a health problem during her trip abroad. Our review of the record convinces us that Ms. Fleming had a nonpecuinary interest as well as a pecuniary interest when she purchased the travel policy. Pursuant to La. C.C. art.1999:
Damages for nonpecuniary loss may be recoverable when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract the obligor knew, or should have known, that his failure to perform would cause that kind off loss.
Although MEDEX set up channels of communication from the date of the accident until the plaintiff's departure from Athens, they delegated the duty to Hygeia Hospital and the plaintiff's treating physician to transport the plaintiff from the hospital to Athen's Airport. The doctor arranged for the ambulance to bring the plaintiff to the airport and arranged for the wheelchair to be waiting for the plaintiff. In our view, the hospital at this point no longer had any responsibility to the plaintiff for her departure. MEDEX should have had adequate personnel in place to see that the plaintiff was not allowed to sit upright in a wheelchair for hours while awaiting her flight home. MEDEX, because of miscommunications and over reliance on Hygeia Hospital and Dr. Radopoulos, failed to adequately evacuate the plaintiff from Greece to New Orleans in accordance with the travel insurance policy contract. As a result of their actions, the plaintiff was forced to endure a nineteen-hour flight in constant pain. Upon her return to New Orleans, she had to undergo numerous operations and rehabilitation to correct her hip fracture. Notwithstanding the stipulation that the initial injury was not the fault of any defendant, the evidence establishes that the bulk of plaintiff's injuries and pain and suffering stem from the hip dislocation. The subsequent pain and life threatening events that followed her hip dislocation clearly support the trial court's award. The plaintiff's peace of mind, or dommage moral, support any nonpecuiniary interest claim by the plaintiff and were clearly taken into account in the trial court's judgment. We find no abuse of the trial court's vast discretion in this award of general damages.

SPECIAL DAMAGES
The defendants argue that the trial court erred in awarding $137,596.90 in special damages. We agree.
The plaintiff's entire claim stems from a travel insurance policy, which is clearly a *282 contract for services. The plaintiff understood that the health coverage provided by the travel insurance policy was secondary to her primary health coverage with Blue Cross and Blue Shield of Alabama and Medicare. The evidence in the record establishes that plaintiff's total medical bills were $95,840.00; of that Blue Cross paid $21,868.54; Medicare paid $63,391.66, and $9,630.64 was written off. The balance of $1,949.31 was paid by Trip Mate. Ultimately, regardless of what medical bills the plaintiff incurred, her primary policies covered them. The defendant's secondary travel insurance policy paid the plaintiff $1,949.31, in medical expenses from the $10,000.00 policy limits in medical coverage in accordance with their contract with Ms. Fleming. The trial court failed to consider that the travel policy medical expense coverage had a $10,000.00 limit in excess of all other policies in which the plaintiff had coverage. The travel policy was never intended to cover her primary medical expenses. Any claims for subrogation or indemnification are not the subject of this appeal.
The trial court in its Reason for Judgment awarded the plaintiff all special damages established at trial. The figure is unsupported by the evidence because the trial court failed to take into consideration the policy limits and conditions of the excess policy, of which $1,949.31 had already been paid to the plaintiff. Accordingly, the judgment of the trial court awarding $137,596.90, is reversed. The plaintiff in not entitled to any special damages because all of her medical expenses have been paid by her primary insurance companies and Trip Mate. All claims for contribution and indemnification are not part of these proceedings

PLAINTIFF'S ASSIGNMENTS:
The plaintiff asserts two assignments of error:
1. The trial court erred in failing to find defendants Group Voyagers, Trip Mate Insurance Agency Inc., and Monumental Life Insurance Company liable pursuant to La. R.S. 22:1220(B)(1), for misrepresenting pertinent facts and coverage of the "Emergency Assistance Service."
2. The trial court erred in failing to find the defendant Trip Mate Insurance Agency Inc., liable pursuant to La. R.S. 22:1220(B)(4), for failing to properly process and pay the plaintiff claims for lost travel expenses and supplemental medical expenses, and in failing to award plaintiff $5,000.00 for each such occurrence.

PLAINTIFF'S ASSIGNMENT OF ERROR I:
The plaintiff contends that the trial court erred in failing to find the defendants liable pursuant to La. R.S. 22:1220 B(1), for misrepresenting pertinent facts and coverage of the "Emergency Assistance Service" coverage, and failing to award penalties of double the amount of the damages sustained by the plaintiff.
Recovery under La. R.S. 22:1220, is available when the insured proves that the insurer knowingly breached its duty of good faith and fair dealing. It is now settled that such a claim may be based only on proof that the insurer committed one of the five acts specified in the statute and prohibited by subsection (B) of that statute. Armstrong v. Rabito, 95-0659 (La.App. 4 Cir. 10/26/95), 663 So.2d 512, writ denied, 95-2819 (La.6/27/97), 696 So.2d 987; Spear v. Tran, 96-1490 (La. App. 4 Cir. 9/18/96), 682 So.2d 267, writ denied, 96-3024 (La.2/7/97), 688 So.2d 500.
In the instant matter, the defendants as insurers were held to a standard of good faith and fair dealing. MEDEX relied on the staff of Hygeia Hospital to follow through with proper evacuation procedures of the plaintiff, or to their detriment delegated their duty to Hygeia Hospital and Dr. Radopoulous. Recovery pursuant to La. R.S. 22:1220, is only *283 available when the insured proves that the insurer knowingly breached its duty of good faith and fair dealings. Although, there may have been a failure on the part of Dr. Yetton to adequately communicate with Dr. Radopoulos, this can in no way be construed to be a knowing breach of duty or a misrepresentation. MEDEX may have failed to take the most prudent precautions, and may have failed to recognize the harm that was likely to flow from their reliance on a third party (Hygeia Hospital/ Dr. Radopoulos), but this action cannot be construed to have been a misrepresentation of the policy, and falls short of bad faith pursuant to La. R.S. 22:1220 B(1). There were numerous communications between Dr. Yetton and the doctors at Hygeia Hospital, which concerned both Ms. Fleming's treatment and her evacuation from Athens. The record indicates that the AAA representative, Ms. Phillips, was also in constant communication with the hospital and MEDEX representatives, throughout the entire ordeal. In fact, she was at Athens Airport and participated in finalizing the details of the return trip. This included obtaining a companion ticket upgrade for herself, in order to assist Ms. Fleming during the flight to New Orleans. MEDEX arranged for the plaintiff's transportation from Delphi to Athens, and arranged for a list of surgeons. Dr. Yetton, their medical representative in Brighton, England, was in communication with the doctors in Greece and approved all of their requests on behalf of Ms. Fleming for MEDEX. MEDEX also inquired on the morning of the flight home if Ms. Phillips or Ms. Fleming needed any further assistance, either in Athens or New Orleans, to which Ms. Phillips responded "no".[8] They upgraded both Ms. Fleming and Ms. Phillips to business class accommodations, as per their interpretation of Dr. Radopoulos' recommendations as to the return flight, and found the most direct route for Ms. Fleming to return to New Orleans. Despite all their efforts, a miscommunication resulted in Ms. Flemings incurring a hip dislocation.
The plaintiff argues that she should have been given two seats as allegedly requested by Dr. Radopoulos which would have allowed her to elevate her feet and enable her to recline. It is apparent that the upgrade to business class seat accomplished this medical accommodation. Even if the plaintiff had been assigned two seats for herself it is unclear how she could have benefited from such an accommodation considering that the hip dislocation had occurred prior to her departure flight. It is unclear from the record why the plaintiff continued on her journey if she was experiencing excruciating pain from the hip dislocation which had occurred while in the airport wheelchair waiting to board the plane for her return to New Orleans. Clearly, the defendants are culpable only for their reliance on the evacuation methods of Hygeia Hospital and the miscommunication between Dr. Yetton and Dr. Radopoulos regarding Ms. Fleming's seating arrangements for her entire journey home.
Therefore, the intent element of La. R.S. 22:1220 is clearly not present and the defendants conduct was in good faith and fair dealing. The trial court was correct in his ruling. Its reasons for judgment specifically states "no doubles", which clearly, addresses penalties pursuant La. R.S. 22:1220. After a careful review of the record, we find no error on the part of the trial court's judgment. There is no merit to this assignment.

PLAINTIFF'S ASSIGNMENT OF ERROR II:
The plaintiff also contends that the trial court erred in failing to find Trip Mate liable pursuant to La. R.S. 22:1220 for failing to properly process and pay the *284 claim of plaintiff for lost travel expenses and supplemental medical expenses.
To successfully assert a claim against insurer from breaching its duty to adjust claims fairly and promptly and to make a reasonable settlement efforts, plaintiff must first have a valid, substantive claim for which insurance coverage is due. Clausen v. Fidelity and Deposit Co. of Maryland, 95-0504 (La.App 1 Cir. 8/4/95), 660 So.2d 83, writ denied, 95-2489 (La.1/12/96), 666 So.2d 320.
The evidence at trial established that plaintiff did not submit anything until her attorney, in July of 1993, forwarded completed claim forms under the medical expense coverage and trip interruption coverage and a few medical records. The evidence further revealed that neither plaintiff nor her counsel ever forwarded any additional documentation or information in support of her claim to Trip Mate. Trip Mate made its needs for additional documentation abundantly clear by letter to plaintiffs counsel dated August 4, 1993. Trip Mate's claim department requested copies of plaintiff's medical bills. These were to include an itemization of charges and services, and an explanation of benefits from Blue Cross and Blue Shields of Alabama and Medicare. Plaintiff failed to respond even after a second request informing the plaintiff that her claim file would be closed if the requested documents were not provided within sixty days. As the Summary Plan Description made clear, the medical expense coverage provided by this travel insurance policy had a $10,000.00 limit in excess of all valid and collectible group or government provided insurance. Trip Mate obviously needed to see what the primary carrier paid before objectively determining their medical liability. Plaintiff admitted at trial that, at the time of her accident, she had insurance coverage with Medicare, Blue Cross and Blue Shield of Alabama and that her coverage under those plans paid all of the medical expenses. Plaintiff was remiss in failing to timely provide adequate information for Trip Mate to make its necessary evaluations of her claim.[9]
Accordingly, for purposes of plaintiff's argument that Trip Mate was in violation of La. R.S. 22:1220 B(4), we find no merit to the claim.
For the aforementioned reasons we find no error in the trial court's general damage award of $1,000,000.00. We do find that the trial court erred in its special damage award of $137,596.90 and reverse its judgment. Furthermore, we reject both of the plaintiffs assignments of error. They are meritless.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] All parties stipulated that defendants are not responsible for the plaintiff's initial injuries.
[2] Dr. Radopoulos was recommended also by Dr. Paris Raftopoulos, who had been recommended by the U.S. Embassy and was under contract with MEDEX as a Program Medical Advisor. Dr. Rex Yetton, is the physician contracted by MEDEX to communicate with Dr. Radopoulos about Ms. Fleming's arrangements and evacuation. There was a dispute at trial as to what Dr. Radopoulos recommended and what Dr. Yetton recommended and committed to MEDEX concerning Ms. Fleming's return trip. Dr. Radopoulos claims he recommended that the plaintiff be flown home business class lying across two business class seats. Dr. Yetton testified that his notes indicated that Dr. Radopoulos recommended one business class seat.
[3] Dr. Yetton was located in Brighton, England.
[4] There is some discrepancy in the testimony as to whether or not eight days after surgery was adequate time in recovery for the plaintiff to travel such a lengthy trip back to the United States. All physicians concurred that after hip replacement, extremes in position and prolonged sitting should be avoided for several weeks.
[5] There is some deviation in the testimony and expert opinions at trial as to when the dislocation occurred. The testimony of both Dr. Rozas and Dr. D'Ambrosia attribute the hip displacement in Athens's Airport and the improper angle in which the hip prosthesis was placed by the doctor in Greece. Dr. Robert Barrack testified that seating did not cause the dislocation, but that the angle of the surgical placement of the acetabular cup by Dr. Radopoulos in Athens was the cause of the dislocation. No dispute exists that dislocation (i.e., the ball coming out of the acetabular cup) is a common complication of total hip replacement surgery.
[6] There is some testimony that Ms. Fleming fell while at home on October 18, 1992.
[7] There is expert opinion in the record that opines that the Greek equipment was different than the American equipment. Furthermore, it was installed incorrectly at the wrong degree and that the dislocation and fracture to this incorrect angle placement at 70 degree as opposed to 45 degrees as recommended by American doctors.
[8] Ms. Fleming had made her own arrangements to have her friend Mr. Millis pick her up from the airport in New Orleans.
[9] Trip Mate ultimately paid the plaintiff for the trip interruption and medical expense claim.