| WILLIAMS, Judge.
In this lawsuit, the plaintiff, Carl Wim-berly, sought damages after allegedly finding a roach in his food at a Popeye’s Fried Chicken restaurant in Shreveport, Louisiana. He also sought damages for an alleged slip and fall incident at the restaurant after he discovered the roach in his food. Two of Wimberly’s companions at the restaurant, Wanda Wimberly and Jacqueline Lee, also sought damages after they allegedly became ill as a result of witnessing the roach in Wimberly’s food. The trial court rejected Wimberly’s claims and this appeal followed.[1] For the reasons set forth below, we affirm the trial court’s judgment.

FACTS

The facts of this case are set forth at length in the carefully considered thirteen-page written opinion of the trial court. A copy of the opinion is attached hereto as an appendix. Particularly pertinent for purposes of this appeal are the portions of the trial court’s opinion which address the plaintiffs claim with regard to the roach in the beans and rice and the plaintiffs claim for his alleged slip and fall. The pertinent portion of the trial court’s opinion concerning the food reads as follows:
Considering the totality of the evidence, the court does not find that Mr. Wim-berly has established by a preponderance of the evidence that the defendant *242 was responsible, directly or indirectly, for the roach which he exhibited on his spoon on the date in question, coming to be in his cup of beans and rice. The manner in which the beans and rice were prepared, the cooking of the rice and the heating of the beans, combined with the necessary “stirring” of the concoction by the customer are all inconsistent with the physical description of the roach by all persons who testified and the photo of the roach in the cup (D-7). Though the photo is blurry, the roach .can be seen well |2enough to determine that it is not covered with “bean gravy” as would be the case if the roach was cooked into or otherwise mixed into the beans and rice. The testimony established that the antennae and legs were intact, and, the body of the roach was free of “bean gravy.” It appears that the roach was already dead when it was placed into the cup of beans and rice immediately before being exhibited to the Popeye’s attendant. It is inconceivable that the roach was “in” the cup of beans and rice at the time Mr. Wimberly purchased the food, or, during the time he ate approximately one-half to two-thirds of his order.
Popeye’s openly contended at trial that Mr. Wimberly placed the roach in question in his order. The court does not find that such was proven but rather, only that Mr. Wimberly failed to prove by a preponderance of the evidence the liability of Popeye’s.
The court specifically finds that Mr. Wimberly’s version of how the roach came to be in his food and, his claim of injury secondary to the incident, are not credible for the many reasons listed herein. His story is filled with inconsistencies, impossibilities and contradictions; his own medical testimony-records depict him as other than a truthful person who was focused on asserting
and pursuing a claim for monetary gain. His claimed injuries are the same as those he suffered in an auto accident shortly before this incident (except for the claimed stomach upset and food phobia). [Footnote omitted.]
The pertinent portion of the trial court’s opinion with regard to the slip and fall claim states:
Here, the plaintiffs witnesses testified they saw a napkin, or napkins, at or around the feet of the plaintiff when they found him sprawled on the white tile floor near the men’s room after the plaintiff walked hurriedly toward the men’s room after purportedly becoming sick to his stomach after the roach incident. The plaintiff testified he did not notice any napkin on the floor until EMS personnel observed and pointed this out to him. However, the EMS personnel did not testify, and, D 14, the EMS “run report,” fails to mention any such observations but rather, attributes to the plaintiff the claim that napkins contributed to his fall. The plaintiffs witnesses and the plaintiff all testified that they did not retrieve, nor did they see anyone else, retrieve any napkin(s) from the area of the plaintiffs feet. The plaintiff and his witnesses were the only 13ones to claim to have seen a napkin near the feet of the plaintiff.
The testimony of the two Popeye’s employees was that they never saw any napkins or other debris in the area of the plaintiffs fall. Further, photographs taken at the time did not show any debris of any kind. (See D-8 & 9.) Although the plaintiff clearly failed in satisfying his burden of proof at trial, the defense introduced testimony about, and, documentation establishing regular inspections and clean-ups if necessary, every hour, and, at high traffic times during the work day, every half-hour, of *243 the entire restaurant area and the area where the plaintiff claims to have slipped/tripped on a napkin in particular. (See D-10.)
Inspection report does not refer to any debris or clean-up necessary of the men’s rest room or adjacent areas during the time frame in question. No napkins were confiscated from the area by any person testifying, or, to the knowledge of persons testifying, or, per the documentation introduced at trial.
The preceding findings of the trial court were made in reference to the court’s conclusion that the plaintiffs claim was subject to the provisions of LSA-R.S. 9:2800.6. Those provisions concern a merchant’s duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. The plaintiff argued in the trial court, and argues again on appeal, that the provisions of Section 9:2800.6 should not apply to the facts of this case. The following portion of the trial court’s opinion addresses what the trial court characterized as the plaintiffs “alternative theory of recovery”:
An alternative theory of recovery was offered in argument on behalf of the plaintiff. The argument was that the inspection of the roach in the cup of beans and rice by the Popeye’s employee was done in a negligent manner in that by the way it was done, it caused the plaintiff to become ill, and then, feeling ill, the plaintiff reasonably walked hurriedly toward the men’s room; then, due to the degree of illness/reaction caused by the observed actions by the Popeye’s employee, the plaintiff slipped/tripped on an object that “but for” the illness brought |4on by the negligent actions of the defendant’s employee, he would not have slipped/ tripped on the napkin. This argument and theory of recovery is not found credible or supported by the evidence by the court.
[[Image here]]
The court finds the plaintiff has failed to carry his burden of proof, pursuant to R.S. 9:2800.6 and, that no proof of negligence by a preponderance of the evidence under any alternative theory of recovery has been shown. Accordingly, a judgment is rendered on behalf of the defendants as to the slip and fall component of this claim.

ASSIGNMENTS OF ERROR

Appellant has made the following assignments of error on appeal:
1. The court erred by ruling that the defendant Popeye’s did not breach its duty, to its customer Carl Wimberly to keep cockroaches out of its restaurant and food prepared on its premises.
2. The trial court erred by placing an undue burden on the plaintiff, of proving how Popeye’s negligently allowed a roach to get into the red beans and rice.
3. The court erred in treating plaintiffs damages from his slip and fall as being subject to R.S. 9:2800.6.
4. The court erred in holding that there was no evidence of spoliation of evidence due to the defendant’s negligent handling of the roach, their failure to produce the videotape, as well as their failure to produce the written statements of the employees at the store, and that plaintiff was not prejudiced.

DISCUSSION

To reverse a trial court’s factual determinations, an appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes the finding is clearly wrong. *244 Stobart v. State Through Department of Transportation and Development, 617 So.2d 880 (La.1993). When findings are based on | ¡¡determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the trier of fact’s finding because only the fact finder can be aware of the variations in demeanor and tone of voice that bears so heavily on the listener’s understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
In the instant case, the trial court did not believe Wimberly and his witnesses, but instead chose to believe the defendant’s witnesses. To a large degree, Wimberly is requesting that this Court review a credibility determination of the trial court under the manifest error/clearly wrong standard of review. The trial court went to great lengths to outline all the relevant evidence, including the inconsistencies with regard to plaintiffs case. After reviewing the record in its entirety, we cannot conclude that the trial court was clearly wrong in its factual findings.
With respect to the roach in the beans and rice, there is a reasonable factual basis in the record from which to conclude that the roach was not introduced into the beans and rice until after Wimberly had eaten a portion of the food. Furthermore, while the court stopped short of concluding that Wimberly or one of his companions placed the roach in the cup, that conclusion is the most plausible under the facts found by the trial court. The only other explanation for the evidence presented is that the roach somehow entered the cup of beans and rice undetected after Wimberly had taken the food to the table and begun to eat it. This latter explanation seems less plausible from the standpoint of detection, and when one considers that |rithe roach was found completely intact, but dead, in the cup. That finding suggests both that the roach entered the cup after the food was taken to the table and that the roach died almost instantly after entering the cup. If the roach had crawled or flown into the cup while the cup was at the table, it would seem much more likely that the roach would not have instantly died, but would have attempted to crawl out of the container. Therefore, because we detect no manifest error in the trial court’s factual findings concerning the time at which the roach entered the cup, we conclude that the dead roach most likely entered into the cup after the food was taken to the table. This conclusion is not indicative of negligence on behalf of the restaurant so as to support a tort claim. Accordingly, we affirm the trial court’s judgment with respect to Wimberly’s tort claim with regard to the roach in the beans and rice. Thus, Wimberly’s first two assignments of error on appeal are rejected.
In his third assignment of error, Wimberly argues that the trial court should not have applied the provisions of LSA R.S. 9:2800.6 to his alleged slip and fall in the restaurant. Instead, Wimberly asserts that his fall was an accident that directly resulted from the Popeye’s employee pulling the dead roach from the meal, followed by Wimberly’s attempt to “dash to the bathroom and vomit.” Initially, we would note that if the slip and fall claim is assessed pursuant to the provisions of Section 2800.6, then Wimberly would have the burden of proving all of the elements of the statute including constructive or actual notice on the part of the merchant. Wimberly did not prove the notice element and his claim for slip and fall, to |7the extent that the claim is governed by the provisions of LSA R.S. 9:2800.6, must fail.
In addressing Wimberly’s alternative claim with respect to slip and fall, the court found no proof of negligence by a *245 preponderance of the evidence. Once again, we conclude that there was no clear error in the trial court’s factual finding in this regard. Having already found a reasonable factual basis for concluding that the presence of the roach in the cup was not due to the defendant’s negligence, we now need only review the question of whether the employee’s act of displaying the roach atop beans and rice on the spoon was “negligence” that could be considered a proximate cause of Wimberly’s alleged slip and fall. We conclude that it was not. Wimberly testified that he himself had placed the roach onto the spoon at the table and had said, “What is this?” while holding the spoon in the presence of his companions. He then placed the spoon and roach back into the cup and went to the counter to complain. We hardly can conclude that the employee’s action in picking up the spoon to look at the roach was a breach of duty when Wimberly had brought the food to the counter to complain. Therefore, we conclude that even if Wimberly’s slip and fall claim is not governed by the provisions of LSA R.S. 9:2800.6, the claim still fails under the facts found by the trial court because there was no breach of duty on the part of defendant. This assignment lacks merit.
Wimberly’s last assignment of error concerns alleged spoliation of evidence with respect to the defendant’s handling of the evidence, failure to produce a videotape, and failure to produce employee statements. IsAceording to Wimberly, a surveillance tape made on the date of the incident, but not maintained by the defendant, “would have proved that the roach was in the red beans and rice when it was served to [Wimberly].” Wimberly also asserts the court should have considered that the employees who witnessed the presence of the roach did not testify and that the defendant failed to produce witnesses’ statements of the incident. Wimberly asserts that by the defendant’s own admission, the specific container of red beans and rice at issue was “left out on a desk and not placed in special packaging or given special markings, resulting in [an] apparent accidental disposal by a cleaning crew.” Wimberly asserts that even if the beans and rice were thrown away by a cleaning crew, the defendant negligently handled the evidence, and it is reasonable to presume that if the condition of the evidence was favorable to the defendants they would have taken more care in preserving it. *
When a party fails to produce evidence available to him, a presumption arises that the evidence would have been unfavorable to him. Morehead v. Ford Motor Company, 29,399 (La.App.2d Cir.5/21/97), 694 So.2d 650, writ denied, 97-1865 (La.11/7/97), 703 So.2d 1265. However, this presumption of spoliation of evidence does not apply when a reasonable explanation exists for the failure to produce the evidence. Morehead, supra. In the instant case, the trial court specifically stated in its written reasons that a reasonable and plausible explanation existed for the failure of the defendant to preserve and/or produce the evidence in question. Further, the court specifically found that all of the testimony and evidence indicated that 19the container of red beans and rice, if produced, would not have aided the plaintiffs cause. Thus, the court stated it could not draw any inference against the defendant because it had inadvertently discarded the evidence. The trial court’s conclusion, once again, is based on factual findings, and we, once again, conclude that there was no manifest error in the trial court’s determination that there was no basis to infer that the evidence was discarded because its preservation would have adversely affected the defendant at trial. The trial court found that the defen *246 dant’s explanation of the inadvertent disposal of the container of beans and rice was reasonable, and we will not disturb that factual finding on appeal.
Next, we note that the videotape did not provide “vital real evidence which would have proved that the roach was in the beans and rice when it was served,” as Wimberly claims. The tape actually was of such poor quality that it would have been of no benefit whatsoever. Finally, with respect to Wimberly’s argument that the defendant’s employees who initially witnessed the incident and evidence did not testify, we note that there is no reason to believe those employees’ testimony would differ from the testimony of the employees who saw the evidence a half an hour later. This assignment of error lacks merit.

CONCLUSION

For the reasons set forth above, the judgment of the trial court is affirmed at appellant’s cost.
AFFIRMED.
I/‘APPENDIX”

OPINION

On April 25, 1996, Mr. Carl Wimberly, his girlfriend at the time Jacqueline Lee, his sister, Wanda Wimberly, and Ms. Wim-berly’s young son went to Popeye’s Fried Chicken restaurant on Mansfield Road in Shreveport shortly after noon for a meal. After ordering red beans and rice, and, after consuming one-half to two-thirds of his meal, Mr. Wimberly claims to have found a roach in his food.
He claims that after reporting this incident to management he began feeling ill and then walked hurriedly towards the men’s restroom. He claims that while in route, he slipped and fell, injuring his head, neck, back and right elbow. He claims that after the fall, he learned a paper napkin was on the floor near his feet. He attributes his fall to the napkin.
Mr. Wimberly seeks compensation for both the roach incident and his fall, claiming physical and emotional damages, medical expenses and lost income from home painting jobs he contends were contracted for, but, which he could not perform due to his injuries. This matter was tried on May 23rd, 2000, with the consent of both parties, before Judge B. Woodrow Nesbitt, Jr.

THE ROACH IN THE RED BEANS AND RICE

At trial, the plaintiff called WANDA WIMBERLY, his sister, who was with him at the time of the incident. Ms. Wim-berly testified that the plaintiff held up his spoon and said, “What is this?”, then went up to the counter and began talking to the attendant. She testified that she did not see what it was the plaintiff was referring to at the time he left their table but that she learned shortly thereafter that the plaintiff claimed he had found a roach in his beans and rice. She further testified that after going to the counter and discussing the matter with the attendant, the plaintiff left the counter and walked in the direction of the men’s restroom. Moments thereafter, the plaintiff was found on the floor near the restroom. He then complained of pain in his right arm and elbow. Ms. Wimberly admitted on cross exam that she did not hear the conversation at the counter between the plaintiff and the attendant as she did not accompany the plaintiff to the counter at the time of his initial complaint.
However, the deposition of JACQUELINE LEE was introduced by the plaintiff as P-8. It contradicted Ms. Wimberly in that Ms. Lee testified that she and Ms. *247 Wimberly ] ^accompanied the ’plaintiff up to the counter when the plaintiff first complained about the roach he claims to have found in his food. Lee depo., page 8, lines 4-12. She also testified that after Mr. Wimberly had fallen, that she and Ms. Wimberly went over to the plaintiff to assist him, and, that at the time of the fall, Ms. Wimberly was at the counter with her and the attendant. Lee depo., page 11, lines 3-19.
While Ms. Wimberly testified that she never saw the roach in the cup of beans and rice at the table, Ms. Lee testified that she was at the table with Ms. Wimberly and the plaintiff when she observed the plaintiff “staring at his spoon” as he held it up above the cup of beans and rice and that when she looked more closely at the spoon, she said out loud, “It’s a roach”. At that time, Ms. Lee testified that she, Ms. Wimberly and her young child and Mr. Wimberly were at the table together. Lee depo., page 4, lines 15-16, page 5, lines 20-22. She testified that after the roach was observed and she said “it’s a roach”, that all of the people at the table accompanied the plaintiff to the counter. Lee depo., page 8, lines 1-12.
While Ms. Wimberly claims to have never seen the roach in the beans while at the table, Ms. Lee clearly testified that she saw the roach after it was “scooped up” on the spoon of the plaintiff, that the antennae were observed by her, and, that the roach was “on top, like” of the beans and rice when it was first observed. Lee depo., page 6, lines 19-22, page 7, lines 9-15. She further testified that before discovering the roach, the plaintiff had been eating the beans and rice for some time. (Page 7, lines 16-18.)
In her deposition, when examined by Mr. Wimberly’s counsel, she was asked:
“Q. Okay, was there gravy on the head?
A: No, I don’t know if the gravy was on the head.”
Page 39, lines 18-25.
A photograph introduced by the defense as D-7, and, though blurry and out of focus, nevertheless reveals a roach “on top of’ the remaining beans and rice in a styrofoam cup. The photo further reveals that the roach was not covered by the beans and rice concoction but rather, appears to be “clean”. It is not covered by “bean gravy” as would have been the case if the roach had been “in” the beans and rice when the meal was assembled or if it had been “stirred in” the beans and rice in the cup by Mr. Wimberly as he ate his meal.
The plaintiff also called ROZELIA MARIE WILLIAMS, a Popeye’s store manager who observed the roach in the cup of beans and rice after she arrived at the store following a report about the incident. She testified the roach was “floating on top” of the beans and rice and was “intact”. She observed the beans and rice below the roach to be “mixed together”.
| ^Testimony from Ms. Williams and from KATHA WOOLFOLK, also called as a plaintiff witness and who was and is an area manager for Popeye’s (who also went to the store at the time of the incident) revealed steamed rice from a storage bin containing rice recently steamed is placed in the cup first, then, the beans are placed on top of the rice[1]. The beans which go into the “beans and rice” are received by the store pre-cooked and then frozen in individual serving packets sealed in plastic. *248 Each packet is heated in boiling water to a predetermined temperature and then emptied into a styrofoam cup. The rice is received in sealed plastic bags, opened, and is then steam cooked and placed into a container until it is used. The two ingredients must be stirred or mixed together by the customer.
The testimony from the Popeye’s employees established that it was extremely unlikely that a roach could be “cooked into” any component part of the beans and rice concoction, or, be between the beans and rice prior to the food being dispensed to the customer without the roach carcass being significantly damaged from the cooking processes and at a minimum, saturated in “bean gravy”. Ms. Woolfolk also testified she observed the roach in the cup and that it was “whole and intact” and that it did not in any way appear to have been “mixed” together with the beans and rice. Again, the photo of the roach in D-7 corroborates her testimony in this regard[2].
The testimony of Ms. Williams and Ms. Woolfolk, and, plaintiffs exhibits PI and P2, and, defense exhibits 11-13, inclusive, established the following: the store in question had areas of light cockroach “activity” as noted in a routine inspection report (P-l) dated February 21, 1996, by a Department of Health inspector and on March 28th and April 16th in the regular monthly pest control (Ecolab) reports (D 12-13). Interestingly, the routine April 30th report of the Department of Heath (P-2) does not mention roaches as having been observed anywhere on the premises. This inspection was only 5 days after the incident and no pest control treatment had occurred between the time of the incident and the subsequent routine inspection.
However, the testimony and the documents referred to established that the areas 1¿where “light roach activity” had been noted were substantial distances away from the food preparation area where all aspects of the beans and rice preparation were done. The “light activity” was observed by the pest control technician around the drive through drink dispenser, a rear door and near a wash basin near the rear of the store[3]. The testimony was clear that no roaches had been observed at any time around the food preparation areas or around the areas where patrons consumed their orders. At no time were the components (cup + ingredients) of, nor the cup of beans and rice prepared for or purchased by Mr. Wimberly, near the areas in the store where roaches had previously been observed. There was no testimony that after the pest control inspection and treatment of April 16, 9 days before this incident, any roaches were observed within the premises. There was no testimony of any inspection and “roach finding” by either the pest control technician or a Department of Health inspector after the incident.*
The court notes that neither the health inspector or the pest control technician who authored respectively, P-l & 2, and, D-ll-13, inclusive, (reports of their observations, actions and recommendations), was called to testify about any roach infestation or activity on the premises in gener *249 al, in the areas where the order in question was prepared or in the area where Mr. Wimberly was eating at times pertinent to the incident in question.
The plaintiff, CARL WIMBERLY testified he ordered red beans and rice, then stirred the beans and rice together and proceeded to eat the concoction along with chicken he had ordered. He testified that after he had eaten about half or more of the beans and rice, he scooped up a spoonful of beans and rice and lifted the spoon out of the cup when he noticed something strange on top of the beans and rice on the spoon. He testified he said, “What is this?” while holding the spoon up in the presence of Ms. Lee and his sister, Ms. Wimberly. The roach was identified, he then placed the spoon with the roach still on it back in the cup and then went to the counter to complain to the attendant.
Mr. Wimberly testified that as a result of observing the attendant hold the spoon up with the roach atop beans and rice on the spoon, that he began feeling ill and walked hurriedly towards the men’s restroom at which time he slipped and fell, injuring his right elbow, back and neck. He testified that the EMS personnel pointed out a napkin near his feet | Rto which he attributes his fall[4].
At the scene, Mr. Wimberly was first tended to by EMS technicians who had placed Mr. Wimberly on a back board. Then, apparently a dispute broke out about where Mr. Wimberly was going to be taken for treatment so Mr. Wimberly refused further care and removed himself from the backboard.
Mr. Wimberly testified that one of the reasons he refused further EMS care was because he wanted to talk to a lawyer about where to seek medical treatment.
It is important to note that the testimony of Mr. Wimberly, his sister, and, the deposition of Ms. Lee, all established that in each of the two auto accidents which preceded the incident in question, and particularly, in the second which occurred only a short time (days to weeks) before the roach/fall incident in question, Mr. Wimberly claimed to have injured his neck, back and right elbow/arm. These were the same body parts he claimed he injured in the fall at issue.
For his elbow, neck and back injuries, Mr. Wimberly sought treatment first from a local physician (the next day), then, on the same day, from a chiropractor from whom, per his testimony, he had received treatment following two car accidents, the first in August of 1995, immediately after his release from a 5 year prison term for possession of cocaine, and, the second, in early April of 1996, just weeks before the roach/fall incident in question.[5]
As a result of the roach incident, Mr. Wimberly claims to have had difficulty eating food, obsessive thoughts about the incident and that as a result of this emotional trauma he sought counseling for his emotional problems stemming from this incident. As a result of the fall, Mr. Wimberly claims the have had his elbow injury for 6 to 7 months, and, a neck-back injury for around 8 months. He claims that as a result of his injuries he was not able to do approximately half a dozen painting jobs he claims were agreed to before his injury.
*250 A close examination of the MEDICAL RECORDS SUBMITTED BY THE PLAINTIFF reveal the following:
-DR. EDWIDG EUGENE, a family or general practice physician, saw the plaintiff on APRIL 26, 1996, the day following the incident. He noted: “Past Medical History: 1 ((Unremarkable”. Mr. Wimberly apparently .failed to tell Dr. Eugene about the two car accidents, and in particular the April, 1996 car accident in which he claimed he had injured the same areas of his body as those examined by Dr. Eugene at the time, based on Mr. Wimberly’s complaints at the time of the exam, i.e., the right arm/elbow, neck and lumbar back areas.
-The exam notes of MAY 2 state Mr. Wimberly complained of nightmares, nausea when he smelled certain foods and right arm pain. “His condition was discussed with the Attorney” also appears as an entry in the record.
-On JUNE 7, Mr. Wimberly was discharged. On each of the noted exams, a contusion to the elbow area was noted, and, in the June exam, some 5 + weeks after the accident, the physician noted “the contusions were resolving”.
Importantly, there is no mention in the exam notes of Dr. Eugene that during the time he was seeing Mr. Wimberly for these complaints that Mr. Wimberly informed the physician that he was also being examined and treated by a chiropractor (for the elbow, neck and back complaints) and, by a psychologist for pain control and management and for his claimed emotional upset stemming from the roach incident.
The MEDICAL RECORDS OF DR. DWIGHT V. HART, a chiropractor, reveal:
-an information sheet filled out by Mr. Wimberly listed “first fall, two car accidents” as to accidents in the past ten years, a general description of the roach/ fall incident and a listing of pain in the “head, back, neck and elbow” as a result of the fall; a handwritten entry that the “elbow, neck and back had been injured before” but with no explanation as to how or when; there is a reference to seeing Dr. Hart “7 months ago” with no reference as to why, and, in response to a form question “How long have you had this problem?”, the response was, “1 day”; further, the information sheet states “no problems immed. preceding fall.” It appears Mr. Wimberly failed to reveal his auto accident was within days or weeks of the roach/fall incident, and, he failed to reveal the fact that the same body areas were injured in the recent auto accident he claimed were injured the day before in the fall incident.
-The record reflects a letter report to plaintiffs counsel on APRIL 26, the day following the incident in which no specific exam findings are discussed, only a general reference to “moderate-to-severe injuries to his spine and its attachments” and a statement that “My initial impression is that the prognosis in this case is guarded.” There is no mention that Mr. Wimberly informed the chiropractor that he had been examined the same day, or, was going to be examined that day, by a physician.
|7The court has reviewed in detail the “reports” rendered by the chiropractor pertaining to “exams” and “treatments” on April 26, April 29, May 1, May 6, May 8, May 14, May 20, May 22, May 28, June 3, June 5, June 10, June 12, June 14, June 19, June 21, June 26, July 8, July 18 and July 22, all of 1996. Without restating all of the contents, the court notes the following:
-On APRIL 26, a “guarded” prognosis, with no articulated diagnosis;
*251 -a “finding” on MAY 7 that Mr. Wimberly “continues to experience psychological difficulties related to the incident of April 25... ” and a “professional opinion” that Mr. Wimberly would benefit from “therapeutic counseling”. This was followed by a referral to a clinical psychologist, Stacy Waldron.
-The letter report of MAY 14 refers to a “symptom complex”, a “good recovery prognosis”, continuing complaints of pain and the expressed need for Mr. Wimberly to receive “periodic supportive care, for the foreseeable future, to help with likely exacerbations.” Some 14 (fourteen) separate diagnostic codes and findings are then listed, including “nervousness”, “acute reaction to stress” and “disturbance of skin sensation-burning, tingling, numbness, an-esthesis of skin, hyperensthesia, hy-poesthesia, paresthesia”, all listed as “slightly improved”.
-The report of JUNE 10 sets forth a description of the incident in question as related by the chiropractor, via Mr. Wim-berly, and, the statements “It was determined that this individual’s prior history is uneventful as it pertains to his current problems” and, “During consultation, it was revealed that this patient has not received prior medical treatment for the injuries ... ”, then, some 10(ten) separate items are listed as “injuries” stemming from the purported roach/fall incident of April 25, 1996. Following these statements, literally pages of physical exam and x-ray finding comments are listed, all finding various aliments, misalignments, injuries, sprains, etc., all attributed to the incident in question, the previously referred to 14 diagnostic code items are again listed, a continued plan of treatment of care is set forth and a prognosis of “fair” is stated.
-On JUNE 12, six more weeks of treatment was recommended and the previously mentioned 14 diagnostic code aliments are again listed.
-On JULY 22, more description of various treatment modalities, aliments and the recurring 14 diagnosis codes are set forth, along with the recommendation that Mr. Wimberly continue with Ms. Waldron (the psychologist to whom Mr. Wimberly was referred by |schiropractor) and that Mr. Wimberly receive treatments from the chiropractor, “1 visit every 3 weeks for 2 months”.
-On AUGUST 1, only ten days after two more months of treatment were recommended (due to the ongoing “inflammation” and pain complaints of the patient) it is reported “(Mr. Wimberly) has notified us that he has apparently reached pre-injury status and will not be returning for treatment. However, since exacerbations are common, the patient was advised to return for therapy should the original symptoms return.” A bill for $2,236.00 for “services rendered” was attached along with a “Doctor’s Lien” on Mr. Wimberly’s claim for compensation from the incident in question.
The MEDICAL RECORDS OF STACY WALDRON, PH.D., “licensed psychologist” were filed by the plaintiff as an exhibit. They reveal the following:
-MAY 20: a statement that Mr. Wim-berly was a referral by plaintiffs counsel with no mention of a referral from Dr. Hart; the comment that a week before, Mr. Wimberly saw Ms. Waldron with no complaint of elbow pain; (it should be noted there is no report or exam note for the “week before”, and, no billing records or statement of date/charge for services was included in the medical records submitted by the plaintiff); statements by Mr. Wimberly claiming stress with his girlfriend, financial stress related to having to pay a monthly parole fee and not being able to work as a result of his injuries and *252 a statement that his attorney had recommended that he see an internist as well as Dr. Hart; statements by Ms. Waldron as follows: “patient is extremely focused on the litigated aspects of this case and stated many times...that Popeye’s owes him.”; “There may be secondary gain involved with the patients condition.”
-JUNE 3: Mr. Wimberly “may be attempting to present himself in an unfavorable light”.
-JUNE 13: “... stated his difficulty with his arm is currently resolved. He is no longer wearing a brace on his arm... he will be able to return to work as of Monday. . .he thinks about this incident on a daily basis and finds that this consumes most of his thoughts”.
-JULY 9: “... doing much better emotionally at this time... getting along better with his girlfriend... he anticipates returning to work in 2 weeks... ”.
-AUGUST 6: “...doing extremely well... has returned to work.. .pain has completely healed in his arms.. .Dr. Hart discharged him 2 weeks ago... getting along very well -with his girlfriend.. .has been able to work overtime and get himself out of debt.. .released from treatment.”

Ic{THE SPOLIATION DOCTRINE

During the testimony at trial, it was established that Popeye’s retained the roach in the cup of beans and rice for the purpose of shipping it to laboratory, per the policy of the home office, for testing to determine if the roach was “cooked into” the food or came to be in the food after the cooking process. The roach was retained by LOUIS REUTHER, another area manager for Popeye’s. Mr Reuther testified that he left the roach and cup of beans in a Popeye’s bag on his desk with the intention to ship the items to the lab the next day. The next morning, the bag was gone. He attributes the lost bag to the clean up crew apparently thinking the bag contained the refuse of a partially eaten meal and thus, discarding it with other trash on the premises. As a consequence of this, there was no testing done on the roach in question.
In response to questions by his counsel and in the argument of his counsel, the plaintiff referred to the accidental disposal of the roach in question. “Spoliation of evidence” was not plead nor specifically argued. However, the court considers the doctrine as having been raised, and, applies it and the governing principles related thereto to the instant facts.
In doing so, the court makes the following findings: a reasonable and plausible explanation exists for the failure of Popeye’s to preserve and/or produce the evidence in question; no prejudice to the plaintiff is shown nor can prejudice reasonably be inferred from the evidence adduced at trial; the testimony, photographs and other evidence were all consistent and supportive of the conclusion that the roach never was “mixed in with” the beans and rice, during the cooking process or after Mr. Wimberly took possession of his food order. The evidence was not discarded through either the negligence of or a deliberate act of the defendant. The mere fact that the evidence was inadvertently discarded does not merit an inference against the defendant because of the overwhelming testimony and evidence that the roach in question was not “cooked in” the food in question or “stirred in” after the cooking process. There is no basis to infer the roach was discarded because its preservation would have affected the defendant adversely. See 694 So.2d 650, 29,399 La.App. 2 Cir. 5/21/97, Morehead v. Ford Motor Co., (La.App. 2 Cir.1997); 742 So.2d 626, 32,190 La.App. 2 Cir. 8/18/99, All Seasons *253 Const., Inc. v. City of Shreveport, (La.App. 2 Cir.1999).
Here, the court specifically finds that all of the testimony and evidence indicates that the roach, if produced, would not have aided the plaintiffs cause. The court cannot draw any inference against the defendant as a result of the roach being inadvertently discarded.

J{^OPINION AS TO THE ROACH IN THE BEANS AND RICE CLAIM

Considering the totality of the evidence, the court does not find that Mr. Wimberly has established by a preponderance of the evidence that the defendant was responsible, directly or indirectly, for the roach which he exhibited on his spoon on the date in question, coming to be in his cup of beans and rice. The manner in which the beans and rice were prepared, the cooking of the rice and heating of the beans, combined with the necessary “stirring” of the concoction by the customer are all inconsistent with the physical description of the roach by all persons who testified and the photo of the roach in the cup (D-7). Though the photo is blurry, the roach can be seen well enough to determine that it is not covered with “bean gravy” as would be the case if the roach was cooked into or otherwise mixed into the beans and rice. The testimony established that the antennae and legs were intact, and, the body of the roach was free of “bean gravy”. It appears that the roach was already dead when it was placed into the cup of beans and rice immediately before being exhibited to the Popeye’s attendant. It is inconceivable that the roach was “in” the cup of beans and rice at the time Mr. Wimberly purchased the food, or, during the time he ate approximately one-half to two-thirds of his order.
Popeye’s openly contended at trial that Mr. Wimberly placed the roach in question in his order. The court does not find that such was proven but rather, only that Mr. Wimberly failed to prove by a preponderance of the evidence the liability of Popeye’s.
The court specifically finds that Mr. Wimberly’s version of how the roach came to be in his food, and, his claim of injury secondary to the incident, are not credible for the many reasons listed herein.[6] His story is filled with inconsistencies, impossibilities and contradictions; his own medical testimony-records depict him as other than a truthful person who was focused on asserting and pursuing a claim for monetary gain. His claimed injuries are the same as those he suffered in an auto accident shortly before this incident (except for the claimed stomach upset and food phobia).
The court does not determine whether Mr. Wimberly or one of his companions placed Inthe roach in the cup, but, finds it was not proven by a preponderance of the evidence to have come to rest in the cup by the negligence of any employee of, or, any act or omission of the defendant.[7] The *254 court therefore finds for the defense on the claim by Mr. Wimberly that he was injured by finding a roach in his cup of red beans and rice.

THE SLIP AND FALL CLAIM

The governing law for a “slip and fall” claim is set forth in Louisiana Revised Statutes 9:2800.6, et seq. The burden is on the plaintiff to prove all of the elements of the statute, including “constructive or actual notice” on the part of the merchant that a hazardous condition existed on the premises prior to the accident in question. The plaintiff must prove that the merchant failed to exercise reasonable care to either prevent the condition, or, to correct it, and, if pled defensively, must address and overcome comparative negligence defenses. The state supreme court has articulated the burden of proof in such cases in White v. Wal-Mart, 97-0393 (La.9/9/97), 699 So.2d 1081. This decision has been interpreted and applied by literally dozens of cases, including O’Brien v. Wal-Mart, 31,-032, 720 So.2d 1263 (La.App. 2nd Cir.1998).
Here, the plaintiffs witnesses testified they saw a napkin, or, napkins, at or around the feet of the plaintiff when they found him sprawled on the white tile floor near the men’s room after the plaintiff walked hurriedly toward’s the men’s room after purportedly becoming sick to his stomach after the roach incident. The plaintiff testified he did not notice any napkin on the floor until EMS personnel observed and pointed this out to him. However, the EMS personnel did not testify, and, D-14, the EMS “run report”, fails to mention any such observations but rather, attributes to the plaintiff the claim that napkins contributed to his fall. The plaintiffs witnesses and the plaintiff all testified that they did not retrieve, nor did they see anyone else, retrieve any napkin(s) from the area of the plaintiffs feet. The plaintiff and his witnesses were the only ones who claimed to have seen a napkin near the feet of the 1 ^plaintiff.
The testimony of the two Popeye’s employees was that they never saw any napkins or other debris in the area of the plaintiffs fall. Further, photographs taken at the time do not show any debris of any kind. (See D 8 & 9). Although the plaintiff clearly failed in satisfying his burden of proof at trial, the defense introduced testimony about, and, documentation establishing regular inspections and clean-ups if necessary, every hour, and, at high traffic times during the work day, every half-hour, of the entire restaurant area and the area where the plaintiff claims to have slipped/tripped on a napkin in particular. ( See D-10).
The inspection report does not refer to any debris or clean-up necessary of the men’s restroom or adjacent areas during the time frame in question. No napkins were confiscated from the area by any person testifying, or, to the knowledge of persons testifying, or, per the documentation introduced at trial.
*255 The court does not find from the evidence submitted that paper napkins on a tile floor would reasonably cause a slip-trip and fall, even if such were present at the time of this incident. Thus, the “unreasonable risk” element of R.S. 9:2800.6 is not satisfied without regard to the other unproven elements of the statute.
An alternative theory of recovery was offered in argument on behalf of the plaintiff. The argument was that the inspection of the roach in the cup of beans and rice by the Popeye’s employee was done in a negligent manner in that by the was it was done, it caused the plaintiff to become ill, and then, feeling ill, the plaintiff reasonably walked hurriedly towards the men’s room; then, due to the degree of illness/reaction caused by the observed actions of the Popeye employee, the plaintiff slipped/tripped on an object that “but for” the illness brought on by the negligent actions of the defendant’s employee, he would not have slipped/tripped on the napkin. This argument and theory of recovery is not found credible or supported by the evidence by the court.
This theory of recovery, a possible “end run around” the proof requirements of R.S. 9:2800.6, was not pled or testified to as a cause in fact of his fall by the plaintiff. They were offered passingly by counsel in his closing argument. The court does not find merit to this argument. A similar argument has been found to be a non-causative factor in a similar incident. See Powell v. Brookshire’s Grocery Company, Inc., 30,047-CA (La.App. 2nd Cir.12/10/97), 705 So.2d 286.
The court finds the plaintiff has failed to carry his burden of proof, pursuant to R.S. 9:2800.6, and, that no proof of negligence by a preponderance of the evidence under any | ^alternative theory of recovery has been shown. Accordingly, judgement is rendered on behalf of the defendants as to the slip and fall component of this claim.

FINAL JUDGEMENT AND COST ASSESSMENT

Judgement is rendered on behalf of the defendants as to all claims asserted by the plaintiff. All costs of this proceeding are assessed against the plaintiff.

. The trial court also rejected the two companions’ claims for damages. Its ruling with regard to these claims is not before us on appeal.

. Though some testimony indicated the beans were placed in the cup first, then the rice placed on top of the beans, the order of the "assembly” of the beans and rice does not change the findings of the court for reasons that will be stated herein.

. Defense photographs Dl-6, inclusive, show the food preparation areas, and, to a lesser extent, the relationship of these areas to the areas where roaches had been observed and where Mr. Wimberly was seated as he ate his beans and rice on the date in question.

. The health inspection report of February 26, 1996, only refers to ''roaches'' and does not identify where roaches were observed; there was no March report introduced; the April report does not mention roaches, only a small opening under the rear door which was repaired within days of the report according to the testimony of the two employees.

. EMS personnel did not testify.

. Mr. Wimberly also referred to another prison term prior to his cocaine conviction in which he served 18 months in jail; however, the nature of this matter was not brought out during the testimony at trial. At the time of trial, Mr. Wimberly was in custody on a parole violation charge, the reasons for which claimed he was unaware.

. For instance, at trial, Mr. Wimberly testified that he threw up several times after the incident, though not until he returned to his home. However, in his deposition it was brought out on cross exam that he testified that he did not throw up on the day of the incident. (Depo., page 49.)
Compare, 736 So.2d 936, 98-1331 La.App. 3 Cir. 3/3/99, Bullara v. Checker's Drive-In Restaurant, Inc., (La.App. 3 Cir.1999), where the plaintiff was found to be "very credible”. The plaintiff testified she bit into, chewed and possibly swallowed a roach in a chili dog bolstered by approximately one-half (1/2) a roach being found in the remnants of the partially eaten chili dog, and, other testimony and evidence.

. The governing law pertaining to foreign substances or things found in food is set forth in Porteous v. St. Ann's Café & Deli, 97-0837 *254 (La.5/29/98); 713 So.2d 454. There, the Louisiana Supreme Court held the proper analysis to determine a defendant’s liability in a restaurant-harmful food product case is found in Louisiana's substantive law as reflected in the Louisiana Civil Code articles pertaining to liability and damages for offenses and quasi offenses — the traditional duty risk tort analysis. A duty risk analysis requires proof of five separate elements: (1) duty; (2) breach of duty; (3) cause-in-fact; (4) scope of liability or scope of protection; and (5) damages. The court in Porteous set out the duty of a food provider as follows: A food provider, in selecting, preparing and cooking food, including the removal of injurious substances, has a duty to act as would a reasonably prudent man skilled in the culinary art in the selection and preparation of food. Porteous, Id. at 457.