829 So.2d 479 (2002)
Queenester Banks RILEY, Fredonia Banks Peters, and Sylvia T. Banks Robinson, each Individually, and Jointly on Behalf of the Estate of Lawrence Banks
v.
MAISON ORLEANS II, INC. and XYZ Insurance Company.
No. 2001-CA-0498.
Court of Appeal of Louisiana, Fourth Circuit.
September 25, 2002.
*481 I. David Warner, III, and Steven J. Rando, Glen A. Woods, The Law Offices of Steven J. Rando, L.L.C., New Orleans, LA, for Plaintiffs.
John B. Dunlap, III, James E. Moore, Jr., Simoneaux Carleton Dunlap & Olinde, L.L.C., Baton Rouge, LA, for Maison Orleans, II, Inc.
John W. Waters, Jr., Bienvenu, Foster, Ryan & O'Bannon, New Orleans, LA, for Maison Orleans, II, Inc.
Emile A. Bagneris, III, David I. Bordelon, Ungarino & Eckert LLC, Metairie, LA, for Scottsdale Insurance Company.
*482 (Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III and Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
Defendants, Maison Orleans II ("Maison Orleans"), and Scottsdale Insurance Company ("Scottsdale"), appeal the judgment of the district court in favor of plaintiffs, Queenester Banks Riley, Fredonia Banks Peters, and Sylvia T. Banks Robinson, individually and jointly on behalf of the estate of Lawrence Banks ("Mr. Banks"), in the amount of $854,729.00. The plaintiffs have also appealed the district court's granting of the defendants' directed verdict as to the wrongful death claims. For the reasons following, we reverse in part, amend in part, and affirm as amended.

Facts
Lawrence Banks was a resident of Maison Orleans, a nursing home in New Orleans, Louisiana. On 16 February 1993 at approximately 4:30 a.m., Joseph Harris attacked Mr. Banks. Mr. Harris, also a resident of Maison Orleans, suffered from organic brain syndrome and was unable to care for himself or his needs. On this particular morning, Mr. Banks was awaiting his morning paper outside of his apartment when Mr. Harris beat him in the head and face with a steel pipe. At trial, Marquitta Patterson, a phlebotomist for Smith Kline Beecham, testified that she saw Mr. Harris hitting Mr. Banks and screamed. At the time of the incident, the attending aids were asleep in the recreational room near the nursing station and a worker from the other side of the building was the first to assist Mr. Banks. Officer Clay Clement of the New Orleans Police Department immediately investigated the incident. Mr. Banks was taken to Lakeland Medical Center/Humana Hospital for emergency medical care.
Prior to his admission to Maison Orleans, Mr. Harris was evaluated by Dr. Richard Richoux, an expert in general and forensic psychiatry. Dr. Richoux confirmed that Mr. Harris' history did not indicate violent behavior and he observed no violent or hostile propensities during the evaluation.[1]
Dr. Richoux noted that Harris had "organic brain syndrome," a condition affecting 75-80% of all nursing home residents and "is pretty much synonymous" with dementia. Dr. Richoux testified that there was no reason to anticipate violent or aggressive behavior from Mr. Harris in the near future and he had no basis to believe that Mr. Harris did not belong in the nursing home. The fact that Mr. Harris was known to "preach" to walls and talk to nonexistent people did not indicate violent tendencies in the context of his condition. There was no reason to order restraints or confine Mr. Harris. Dr. Richoux testified that when he examined Mr. Harris, Mr. Harris was taking Ativan and Hydergine.[2]
*483 Dr. Richoux testified that "wandering behavior is sometimes a problem" among those suffering from organic brain syndrome, but Mr. Harris had not been known to wander. Dr. Richoux explained that such individuals do not normally require someone following them around twenty-four hours a day:
A. So, probably the most common reason why somebody in a nursing home who has Organic Brain Syndrome might need to be closely observed is more along the lines of, if you have the unlocked facility with easy access to the outdoors, and nobody checks on an individual often enough. There have been incidences where people walked out of the door and gone walking down the street in a disorienting manner, but no other reason than that generally.
Q. Not following them around inside the nursing home?
A. No[t] usually. Not unless there's some access to danger, which of course, in any well designed facility. I'm talking about machinery that a confused individual is going to be subject to machinery that they can hurt themselves with or something of that nature.
On cross-examination, Dr. Richoux explained that the only thing that he wrote concerning what may have been reported to him by others concerning Mr. Harris' behavior at the nursing home was his notation that: "aid who accompanies him reports no agitated or hostile behavior and none is noted."
When asked by the trial judge whether it would be normal for someone in Mr. Harris' condition to strike someone else with a lead pipe, Dr. Richoux responded:
No, Your Honor. I would not consider it to be in a normal range. But I would consider it to be very unusual as a manifestation of what I perceive his psychiatric condition to be. It's not something that one expects of a person because they qualify for a diagnosis of Organic Brain Syndrome or Dementia. So, therefore, there's no way to put someoneif I diagnose Organic Brain Syndrome or Dementia I don't usually say either to a nursing home or to a care taker, for that matter, "Now, people with this condition frequently get violent so you better watch out."
Dr. Richoux conceded that had the nursing home placed Mr. Harris under twenty-four hour supervision, the incident might not have occurred. However, Dr. Richoux also explained that twenty-four hour supervision means that the patient should be checked frequently, not that the patient be literally followed around and/or kept under constant surveillance.
Eric Wilmore, the Assistant Administrator who ran the nursing home at the time of the incident, explained that the notation in Mr. Harris records, "Unable to care for self. Needs 24-hour supervision," refers to the basic reason that people are in a nursing home to begin with; it is meant "to ensure that they bathe, that they eat, that their medication is given...."
Mr. Wilmore testified that the nursing home does not have the capacity to lock people down and restrain them. In fact, he noted that La. R.S. 40:2010.8A(10) mandates that nursing home residents be free *484 from physical and chemical restraints with certain very limited exceptions inapplicable to the instant case. He stated that Mr. Harris was an appropriate resident for the nursing home:
Actually, he was pretty typical of a nursing home patient. He was elderly; he suffered from a certain degree of senility, as a lot of nursing home patients do. He had no history of being violent, being combative or hostile.
Mr. Wilmore testified that Mr. Harris would have been able to get the pipe in the maintenance room and go to where he beat Mr. Banks without being seen by any of the employees even had they been awake. This corroborated Ms. Patterson's testimony that she did not see Mr. Harris pass in the hallway and could not see what was going on some 75 feet down the hallway from the nurses' station where she was. Ms. Patterson testified that when she arrived and while she was there, there was a nurse at the nurses' station "watching call buttons."
Mr. Wilmore testified that Mr. Harris was in room 111, Mr. Banks was next door in room 109, and his office was next to Mr. Banks' room. Consequently, he saw and spoke to Mr. Harris and Mr. Banks on a daily basis. Mr. Wilmore further stated:
Q. When the nurse's aids aren't doing rounds; what can they do? Can they be in the rec room?
A. Yes, they can.
Q. Where are they supposed to be?
A. They should be available for the nurse. If someone pushes one of those call buttons, and the nurse is there to answer the call and send the nurse's assistant to the room.
Q. How available are nurse's aids in the rec room?
A. The rec room, and I imagine the reason they were in there is because it is directly across from me to you form the nurse's station.
Q. So they were available? They were available there?
A. Yes.
Q. This rec room, is this in line of sight down that hall where the beating took place?
A. Not where the incident occurred, no.
Q. So, if somebody in the rec room would not necessarily be able to see what was going on all the way at the court? [Sic]
A. No.
We note, however, that the record reflects that one of the nursing assistants, Regina Guillory, saw Mr. Harris with the pipe before the attack. She asked him for the pipe and he refused to give it up. He then ran though the courtyard and into the lobby where he proceeded to hit Mr. Banks several times in the head. Ms. Guillory claims that Mr. Harris then ran to his room and said, "I got you now, you f---er."[3] Mr. Banks sustained numerous head injuries, lacerations, and fractures and underwent surgery in relation to the beating. Mr. Banks later died on 20 April 1993 of a heart attack.

Procedural History
On 30 August 1993, the plaintiffs filed suit against Maison Orleans, and its insurer, Scottsdale, asserting a survival action, wrongful death claim, negligence claim, and a claim for insurance coverage. An excess insurer, United National Insurance Company, was later added as a defendant. *485 Both insurance companies filed motions for summary judgment asserting policy exclusions for "sexual and physical abuse." United National Insurance Company was dismissed from the suit and Scottsdale's motion was granted in part.
On 24 May 2000, the jury was dismissed after they were observed talking and passing notes. The matter continued as a bench trial. A final judgment was rendered in favor of the plaintiffs and against Maison Orleans and Scottsdale on the survival and negligence claims for the following:

General Damages $700,000.00
Special Damages:
 Lakeland Medical Center 117,206.00
 Touro Infirmary 33,210.00
 Beverly Enterprises 2,112.00
 Dennis Mortuary Funeral Expenses 2,143.00
Total $854,729.00

In its reasons for judgment, the trial court stated:
The harm encountered by Banks falls within the scope of protection afforded by Maison's duty which was breached by its negligence. Here, Maison had a duty to provide supervision of its residents at or about the time of the incident. Defendants do not refute this fact nor do they refute that their on duty staff members were asleep during the time of the incident. Furthermore, the availability of the steel pipe to Harris created an unreasonable risk of harm to Banks. As a result, it is reasonable to conclude that the risks and degree of harm suffered by Banks were not the result of his own actions and could have been significantly reduced if the defendant's staff members had been available.
Although Maison Orleans' motion for directed verdict on the wrongful death claim was granted, it appeals the judgment of the district court on the issues of liability and damages. Scottsdale moved for a new trial or, in the alternative, to modify the judgment, both of which were denied. Scottsdale brings a separate appeal regarding its limitations of coverage and whether the district court awarded the plaintiffs excessive damages. The plaintiffs appeal the district court's granting of Scottsdale's motion for partial summary judgment.

Duty-Risk Analysis
In its first assignment of error, Maison Orleans argues that it did not breach the standard of care imposed on nursing homes, which is of reasonable care considering the patient's mental and physical condition. Roberson v. Provident House, 559 So.2d 838 (La.App. 4 Cir.1990), reversed in part on other grounds, 576 So.2d 992 (La.1991). It further contends that it did not have a duty to furnish a nurse or attendant to supervise Mr. Harris at all times. See McCartney v. Columbia Heights Nursing Home, Inc., 25,710 (La. App. 2 Cir. 3/30/94), 634 So.2d 927.
Under the duty-risk analysis, the pertinent inquiries are: 1) whether the conduct of which plaintiff complains was a cause-in-fact of the harm; 2) whether there was a duty on the part of the defendant which was imposed to protect against the risk involved; 3) whether there was a breach of that duty; and 4) damages. Eldridge v. The Downtowner Hotel, 492 So.2d 64 (La.App. 4 Cir.1986); Vicknair v. Hibernia Bldg. Corp., 479 So.2d 904 (La. 1985).
We agree with Maison Orleans's claim that the admission of Mr. Harris into the nursing home did not violate its standard of care. Dr. Richoux testified that that there was nothing in Mr. Harris' presentation to indicate that Maison Orleans would not be an appropriate facility for him. On the other hand, Mr. Banks and his family also expected some reasonable *486 amount of protection for Mr. Banks while in the facility.
We disagree, however, that Maison Orleans' twenty-four hour supervision of Mr. Harris was proper and that sleeping aides in the recreational room that morning was not a direct cause of Mr. Banks' injuries. The uncontroverted evidence indicates that Mr. Harris should have been checked at least every two hours. Even Dr. Richoux testified that had the nursing home had Mr. Harris under twenty-four hour supervision, the accident might not have happened. In addition, had even one aide been awake and on the floor that morning, Ms. Guillory could have sought immediate help when she observed Mr. Harris with the pipe before the attack. Thus, we find that the obvious lack of supervision contributed to Mr. Banks' injuries. Further, had the aides not been asleep, it is reasonable to assume that Mr. Banks would have been afforded more protection at the time of the incident.
Mr. Harris was also a cause-in-fact of the injuries suffered by Mr. Banks. Mr. Harris and Mr. Banks were both under the custody and care of Maison Orleans, which had a duty to protect Mr. Banks against the attack upon him. We find that Maison Orleans breached its duty because Mr. Harris was able to retrieve a pipe from the premises and attack Mr. Banks while the attending aides were asleep. Thus, we agree with the trial court's imposition of liability upon Maison Orleans. This assignment of error lacks merit.

Comparative Fault
Maison Orleans next argues that the district court erred in failing to assess some degree of fault to Mr. Harris. It relies on Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), wherein the Court stated:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including (1) whether the conduct resulted from inadvertence or involved an awareness of danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
The trial court held that Mr. Banks' injuries resulted from the conduct of Mr. Harris and the absence of reasonable supervision owed to Mr. Banks as a resident of the nursing home. No question exists that but for the actions of Mr. Harris, Mr. Banks would not have been injured. However, the risk created by Maison Orleans also contributed to the plaintiffs' damages. Mr. Harris was able to retrieve a pipe and, according to trial testimony, he was not properly supervised per the facility's own guidelines. The district court was impressed by the fact that the aides were asleep, and we agree that this was a major factor. The risk created was not slight and Maison Orleans cannot evade responsibility for its actions by arguing that Mr. Harris was solely at fault as an intentional tortfeasor.
Recently, the Louisiana Supreme Court decided Wallmuth v. Rapides Parish School Board, XXXX-XXXX, XXXX-XXXX (La.4/3/02), 813 So.2d 341, which gives us guidance in comparing the fault of the intentional tortfeasor to that of the negligent *487 tortfeasor.[4] There, the court found that the allegedly negligent tortfeasor (school board) was not at fault for the plaintiff's injuries because of the spontaneous nature and unforeseeability of the intentional tortfeasor's actions, which the allegedly negligent tortfeasor could have neither foreseen nor prevented by exercising a reasonable degree of supervision. Id. at pp. 11-12, 813 So.2d at 348-49. We find, however, the present situation distinguishable.
It is axiomatic that a nursing home operates to protect its residents from injury to a reasonable degree. In the case at bar, but for the sleeping employees and the failure to provide appropriate supervision to Mr. Harris, Maison Orleans could have prevented some, if not all, of Mr. Bank's injuries. It is significant that one of Maison Orleans' employees saw Mr. Harris with the pipe before the attack, yet did nothing to summon assistance. However, we agree with Maison Orleans and find that the trial court erred in failing to assign some percentage of fault to Mr. Harris, the intentional tortfeasor.
Therefore, we reduce Maison Orleans' liability to the highest possible percentage that our law would allow. We find that percentage to be 75%; accordingly, we assess Mr. Harris with 25% of the fault associated with Mr. Banks' injuries.

Damages
The defendants argue that the award for general damages in the amount of $700,000.00 was excessive, relying on the testimony of Dr. Maynard Garrett, an expert witness in the field of general surgery, who testified that Mr. Banks "made an amazing recovery." However, the evidence also showed that Mr. Banks sustained not only a closed head injury and fractured skull, but also significant facial fractures which required four surgical procedures; he was unable to eat by mouth because his jaw was wired shut, was in severe pain, and also became very depressed. His daughters testified that he underwent an entire personality change after the attack. The record establishes that the final two months of this elderly gentleman's life were made completely miserable by this incident.
The initial inquiry is whether the award for the specific injuries and their effects under the particular circumstances of the injured person is a clear abuse of the "much discretion" of the trier of fact. Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only if an abuse of discretion is found does the reviewing court refer to prior awards and then only for the purpose of determining the highest or lowest point, which is reasonably within that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) certiorari denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). In effect, the award or apportionment must be so high or so low in proportion to the injury or fault that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La. App. 5 Cir.1991).
In Bernard v. Lott, 95-0167 (La. App. 4 Cir.12/28/95), 666 So.2d 702, the district court awarded the plaintiff $200,000.00 for a closed head injury; this Court, however, declared the award inadequate and pronounced that, based upon the survey of the appropriate case law, "the *488 lowest general damage award is $750,000." Id. at pp. 11-12, 666 So.2d at 708. In the instant case, the general damage award of $700,000.00, while on the high side in light of the duration of the injuries, was well within the discretion of the district court. Therefore, we will not disturb the award for general damages on appeal because it does not shock the conscience in a way that purports to manifest error by the district court.
In their cross appeal, the plaintiffs argue that the district court erred in its analysis of the quantum for a closed head injury. The plaintiffs support their argument by citing Bernard v. Lott, supra, wherein the district court awarded the plaintiff, a head trauma patient with personality change and emotional instability, $200,000.00 in general damages associated with the injury. However, this Court raised the award to $750,000.00.
Bernard is distinguishable from the instant case because Ms. Bernard's IQ dropped from 113 while in high school to 83 after her accident. Her most severe deficiencies were in the areas of concentration and memory, which affected all aspects of her life. Unlike in the instant case, we found that the district court in Bernard erred in not considering the weight of the numerous expert medical testimonies as to Ms. Bernard's condition, whether preexisting and aggravating or a direct result from her head-on collision. In the matter sub judice, we are of the opinion that all of the medical testimony on behalf of Mr. Banks' condition was considered by the district court and that the quantum was well within its discretion.
The plaintiffs were also awarded $117,206.00 for expenses incurred for treatment of Mr. Banks' at Lakeland/Humana Hospital. Maison Orleans argues that no bills from Lakeland/Humana were introduced and that the evidence introduced by the Banks to prove the bill constituted hearsay.
At trial, the plaintiffs submitted a letter from Medicare verifying the lien against Mr. Banks for his treatment at Lakeland/Humana in the above amount. The Medicare statement was introduced because, according to the record, the billing records were destroyed due to the age of the account. Along with the medical records was the testimony of Dr. Maynard Garrett who testified at trial that he was the treating physician who performed two surgeries at Lakeland/ Humana on Mr. Banks associated with the incident at Maison Orleans.
Plaintiffs bear the burden of proof as to all elements of damages in their lawsuits. Winston v. Flamingo Casino, 99-0209 (La.App. 4 Cir.9/22/99), 746 So.2d 622, 624. The district court found that the plaintiffs met their burden of proving the medical expenses incurred although there was no submission of a medical bill directly from Lakeland/Humana. We find that the trial court was not manifestly erroneous to rely on the Medicare letter to support the award of $117,206.00 to the plaintiffs because the original records were destroyed.
Maison Orleans further asserts that the district court erred in awarding the plaintiffs expenses for treatment of Mr. Banks at Touro Infirmary and funeral expenses. Maison Orleans contends that the treatment at Touro Infirmary was due to the heart attack, from which Mr. Banks subsequently died.
In reviewing the factual findings, an appellate court is limited to a determination of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978), writ denied, 374 So.2d 660 (La. 1979); Fleming v. American Auto. Association, Inc., 99-1638 (La.App. 4 Cir. 6/21/00), 764 So.2d 274. An appellate *489 court, while it must give great weight to a trial court's factual findings, is not bound by reasonable inferences. Jones v. Northbrook Ins. Co., 544 So.2d 742 (La.App. 3 Cir.1989).
We find merit in Maison Orleans' argument. Dr. William Newman, a pathologist who testified by a videotaped deposition, testified that Mr. Banks died of a heart attack. He further testified that while Mr. Banks' injuries could have contributed to his heart condition, his injuries were not the cause of death. The district court concluded:
[T]his court finds that there is conflicting evidence that Banks' cause of death was directly a result of the February 16th beating. The coroner's report and Dr. William Newman's testimony were persuasive and convinced the court that Banks died of a heart attack due to arterial sclerosis. Plaintiff's [sic] evidence failed to substantiate more than a weak circumstantial connection of plaintiff's [sic] injuries resulting from the 1993 beating and his death more than two months later. Thus, without more, plaintiff's [sic] claim for wrongful death fails.
As will be established below, the district court correctly dismissed the wrongful death claim. Therefore, if the district court was correct in finding that the death of Mr. Banks was not a result of the beating, it erred in awarding damages for treatment at Touro Infirmary and funeral expenses paid to Dennis Mortuary. Consequently, we reverse the award of $35,353.00 for expenses paid to Touro Infirmary and Dennis Mortuary.

Wrongful Death Claim
Each of the plaintiffs, as Mr. Banks's beneficiaries, filed a wrongful death claim against Maison Orleans pursuant to LA. C.C. art. 2315.2.[5] The claims were dismissed by the trial court by a directed verdict in favor of Maison Orleans. The plaintiffs request review of the district court's judgment dismissing their claim.
In its Reasons for Judgment, the district court concluded that the testimony of Dr. William Newman, coupled with the coroner's report, evidenced that Mr. Banks died from a heart attack. Further, the record reflects that the plaintiffs failed to provide convincing evidence to contradict Dr. Newman's testimony.
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973, 976 (La.1991). Based on the record before us, we find that the district court's conclusion that Mr. Banks died of a heart attack is a reasonable one and that the district court did not err in making such a finding and dismissing the claim for wrongful death.

Insurance Coverage
On 27 October 1999, the district court partially granted Scottsdale's motion for summary judgment to enforce its limitation of coverage. The partial summary judgment granted prior to trial clearly was not a final judgment absent certification as *490 such by the trial court. See La. C.C.P. arts. 1915 and 966(E). Therefore, the trial judge had the discretion to change the substance of that interlocutory ruling at any time prior to the rendering of the final judgment. See Carrier v. Carner, 97-128, p. 5 (La.App. 3 Cir. 6/18/97), 698 So.2d 34, 36. The final judgment held Scottsdale liable in solido with Maison Orleans without stating Scottsdale's policy limitations of $25,000.00. Scottsdale's motion for new trial seeking to reform the judgment to include the limitation was denied by the trial judge, whose comments on the record indicate that he erroneously believed that the partial summary judgment had been made final. Scottsdale applied for supervisory review of the trial court's denial of its motion for new trial, and this Court denied the writ application citing an adequate remedy on appeal. Scottsdale separately appeals this issue, which is opposed by the plaintiffs and Maison Orleans.
At its summary judgment hearing, Scottsdale argued that the insurance policy on behalf of Maison Orleans contained a sexual and/or physical abuse exclusion and separate endorsement for coverage for such incidents in the amount of $25,000.00. Maison Orleans and the Banks argue that the district court erred in granting the summary judgment as to Scottsdale's insurance limitations. We can dispose of the issue by reviewing the insurance policy in question and either amend or maintain the district court's final judgment in accordance with our finding.
The relevant portion of the insurance policy reads:
This policy does not apply to any injury sustained by any person arising out of or resulting from sexual and/or physical abuse by:
1 any Insured;
2. any employee of any Insured or
3. any person performing volunteer services for or on behalf of the Insured; or
4. any other person.
The Company shall not have any duty to defend any suit against the Insured seeking damages on account of such injury.
The intent of this endorsement is to exclude all injuries sustained by any person, including emotional distress, arising our of sexual and/or physical abuse, including but not limited to sexual and/or physical abuse caused by negligent employment, investigation, supervision, or reporting to the proper authorities, or failure to so report, or retention, of a person for whom any insured is or ever was legally responsible.
All other terms and conditions remain unchanged.
However, the policy also contains a separate coverage endorsement that contains an expansion of coverage, affording coverage in the amount of $25,000.00 for each claim for sexual and/or physical abuse. The endorsement reads as follows:
I. COVERAGESSEXUAL AND/OR PHYSICAL ABUSE LIABILITY
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to any person arising out of sexual/and or physical abuse, caused by one of the insured's employees, and the Company shall have the right and duty to defend any suit against the insured seeking such damages, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and such settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit *491 after the applicable limit of the Company's liability has been exhausted.
Interpretation of an insurance contract is usually a legal question that can be properly resolved in the framework of a motion for summary judgment. Jones v. Yacht Club, 96-300 (La.App. 3 Cir. 10/23/96), 682 So.2d 816, citing Wallace v. Huber, 597 So.2d 1247 (La.App. 3 Cir. 1992). Furthermore, it is well settled that in an absence of a conflict with the laws or public policy, insurers have the right to limit their liability and to impose whatever conditions they please upon their policy obligations under the policy. Fruge v. First Continental Life and Accident Ins. Co., 430 So.2d 1072, 1077 (La.App. 4 Cir.), writ denied, 438 So.2d 573 (La.1983), citing Oceanonics, Inc. v. Petroleum Distributing Co., 292 So.2d 190, 192 (La.1974).
Although the term "abuse" is not defined in the policy, taking that term in its usual meaning and context, we cannot agree that this incident constituted "sexual or physical abuse." Physical abuse, as opposed to simple assault, is generally the act of a person in control, dominance, or authority who misuses his position to harm or mistreat a person over whom he exercises such control. The act of one nursing home resident attacking a fellow resident is not abuse because the element of control is lacking. Moreover, we do not agree that the beating of Mr. Banks by Mr. Harris is equivalent to physical abuse caused by a Maison Orleans employee, when the liability of the Maison Orleans is actually based on negligence: the failure of its employees to properly supervise the residents. Negligence does not equate to abuse. Finally, to the extent that the insurance policy provision is ambiguous, we are obliged to construe the ambiguities in favor of the insured to effect, not deny, coverage. See Doerr v. Mobil Oil Company, 00-0947, p. 5 (La.12/19/00), 774 So.2d 119, 124 (and cases cited therein). It is undisputed that Scottsdale's policy has a $1,000,000.00 limit on coverage for personal injury due to the negligence of Maison Orleans.
We find, therefore, that the district court erred in applying the exclusions of the insurance policy to the instant case by partially granting the motion for summary judgment. Accordingly, we reverse and set aside the partial judgment previously entered by the trial court. In addition, because the final judgment of the district court holds Scottsdale responsible in solido with Maison Orleans for the entire amount of damages, and those damages are less that the limits of the insurance policy, we need not amend the judgment in that regard.

Decree
For the reasons stated herein, we amend the judgment of the district court to assess Maison Orleans II with 75% of the liability and Mr. Joseph Harris with 25% of the liability. In addition, we amend the judgment to reduce the amount of total damages to $819,376.00, by deleting the special damages awarded for treatment at Touro Infirmary and funeral expenses paid to Dennis Mortuary. Further, we reverse the partial summary judgment in favor of Scottsdale Insurance Company. In all other respects, the judgment is affirmed. Each party is to bear its own costs of this appeal.
REVERSED IN PART; AMENDED IN APART; AFFIRMED AS AMENDED.
BYRNES, C.J., and JONES and McKay, JJ., concurs in part and dissents in part.
BYRNES, C.J., CONCURRING IN PART AND DISSENTING IN PART.
I concur with the majority analysis of the issue of insurance coverage. However, *492 as I find that there is no liability on the part of Maison Orleans II, Inc., I respectfully dissent from the balance of the majority opinion.
The Maison Orleans is not an insurer of Mr. Banks' safety. A nursing home has no duty to furnish a nurse or attendant at all times. McCartney v. Columbia Heights Nursing Home, Inc., 25,710 (La.App. 2 Cir. 3/30/94), 634 So.2d 927.
The trial court found that, "the availability of the steel pipe to Harris created an unreasonable risk of harm to Banks." However, it is not as though the steel pipe had been dropped carelessly in the hall outside of Harris' door. Mr. Wilmore testified that the pipe was used to prop open the door to a maintenance shed behind the kitchen, accessible only from the outside. Heavy door-stops are quite common. Harris could have struck Banks with any number of other objects that would have been reasonably available. Unlike a gun or a knife, the pipe was not intrinsically dangerous. It was only dangerous in the manner in which it was used. Even a bedpan, a hardbound book, a telephone or any number of other common items readily available to nursing home residents could have been used by Mr. Harris to strike Mr. Banks.
Mr. Harris was evaluated by Dr. Richard Richoux, an expert in general and forensic psychiatry, prior to admission to Maison Orleans II facility. Running Dr. Richoux's name through case law data bases reveals that he has qualified as an expert in countless cases, testifying at various times on behalf of the plaintiff, the defendant, the State, and as a court appointed expert. Dr. Richoux confirmed that Mr. Harris' history did not indicate violent behavior and he observed no violent or hostile propensities.
Dr. Richoux noted that Harris had Organic Brain Syndrome, a condition affecting 75-80% of all nursing home residents and "is pretty much synonymous" with Dementia. Organic Brain Syndrome is not indicative of violent proclivities. Dr. Richoux testified that there was no reason to anticipate violent or aggressive behavior from Mr. Harris. He had no reason to believe that Mr. Harris did not belong in the home. The fact that Mr. Harris was known to "preach" to walls and talk to nonexistent people is not considered to be indicative of violent tendencies in the context of Mr. Harris' condition. The plaintiff produced no evidence from which the contrary can be inferred and it was error for the trial court's reasons for judgment to suggest otherwise.
Dr. Richoux testified that "wandering behavior is sometimes a problem" among those suffering from Organic Brain syndrome, but the record reflects that Mr. Harris had not been known to wander. Such individuals do not normally require someone following them around twenty-four hours a day:
A.... So, probably the most common reason why somebody in a nursing home who has Organic Brain Syndrome might need to be closely observed is more along the lines of, if you have the unlocked facility with easy access to the outdoors, and nobody checks on an individual often enough. There have been incidences where people walked out of the door and gone walking down the street in a disorienting manner, but no other reason than that generally.
Q. Not following them around inside the nursing home?
A. No usually. Not unless there's some access to danger, which of course, in any well designed facility. I'm talking about machinery that a confused individual is going to be subject to machinery that they can *493 hurt themselves with or something of that nature. [Emphasis added.]
Thus, any close supervision of Mr. Harris that might have been warranted would not have been intended to prevent him from picking up an object with which to strike another resident of the nursing home.
On cross-examination, Dr. Richoux explained that the only thing that he reported in written form concerning what may have been reported to him by others concerning Mr. Harris' behavior at the nursing home was his notation that: "Aid who accompanies him reports no agitated or hostile behavior and none is noted."
Dr. Richoux read from his report stating that his examination revealed that Mr. Harris, "shows typical evidence of Organic Brain Syndrome. Rambling conjectural speech, apparently delusional thought, disorientation, memory deficits, lay bow [sic] mood and affect." He went on to explain "delusional" meant, "thinking manifested by a person which is clearly in contradiction to objective reality, and which defies rational proofs to the contrary."
When asked by the trial judge whether it would be normal for someone in Mr. Harris' condition to strike someone else with a lead pipe, he responded:
No, Your Honor. I would not consider it to be in a normal range. But I would consider it to be very unusual as a manifestation of what I perceive his psychiatric condition to be. It's not something that one expects of a person because they qualify for a diagnosis of Organic Brain Syndrome or Dementia. So, therefore, there's no way to put someoneif I diagnose Organic Brain Syndrome or Dementia I don't usually say either to a nursing home or to a care taker, for that matter, "Now, people with this condition frequently get violent so you better watch out."
Dr. Richoux did opine that had the nursing home had Mr. Harris under twenty-four hour supervision the incident might not have occurred. However, it is also clear from Dr. Richoux's testimony that had there been a recommendation of twenty-four hour supervision in Mr. Harris' case, it would have been for his protection and not for the purpose of protecting third parties from him, i.e., had there been a duty in the instant case to provide Mr. Harris with twenty-four hour supervision, it was a duty owed to him and not to third parties. Consequently, a violation of that duty would create no liability to third parties other than third parties who could have rights arising from injuries sustained by Mr. Harris, e.g., his survivors in case he were to sustain a fatal injury attributable to lack of supervision.
On redirect examination when asked to clarify what is meant by twenty-four hour supervision, Dr. Richoux explained that it meant that the patient should be checked frequently, not that the patient should be literally followed around and/or kept under constant surveillance.
Eric Wilmore, the Assistant Administrator who ran the Maison Orleans II Nursing Home at the time of the incident, explained that the notation in Mr. Harris records, "Unable to care for self. Needs 24-hour supervision," refers to the basic reason that people are in a nursing home to begin with and it is meant "to ensure that they bathe, that they eat, that their medication is given ..."
Mr. Wilmore testified that the nursing home did not have the capacity to lock people down and restrain them. In fact, LSA-R.S. 40:2010.8A(10) mandates that nursing home residents be free from physical and chemical restraints with certain very limited exceptions inapplicable to the instant case. He testified that he saw no *494 reason why Mr. Harris was not an appropriate resident for the nursing home:
Actually, he was pretty typical of a nursing home patient. He was elderly; he suffered from a certain degree of senility, as a lot of nursing home patients do. He had no history of being violent, being combative or hostile.
Mr. Wilmore further testified that nursing home residents are given a list of their rights in their admission packet, which rights include the right:
To be free of mental and physical abuse and of restraints, not documented as medically necessary.
As matter of law Mr. Harris had the right to privacy in his room and the right to retain personal possessions. LSA-R.S. 40:2010.8. In other words, Mr. Harris was entitled to have legal access to any number of objects, which could inflict bodily harm if wielded with the intention to do so. There are any number of conceivable and permissible personal possessions that could be used to strike another resident, for example, hardbound books, paper weights, mugs, clocks and telephones, just to name a few. In fact, there is an express statutory right to phone access. LSA-R.S. 40:2010.8A(2)(a). Mr. Harris' was not an inmate, he was a resident. He was not interdicted or confined. In other words, it was Mr. Harris' decision, however poorly arrived at, to cause harm and not the lead pipe that was the legal cause of Mr. Banks' injuries, because had he not had access to the lead pipe he would have had access to any number of other items. The lead pipe was not intrinsically dangerous, e.g., it was not a gun, poison, or highly combustible.
Mr. Wilmore testified without contradiction that Mr. Harris would have been able to get the pipe in the maintenance room and go to where he beat Mr. Banks without being seen by any of the sleeping employees even had they been awake. This corroborated Ms. Patterson's testimony to the effect that she did not see Mr. Harris pass in the hallway and that she could not see what was going on some 75 feet down the hallway from the nurses' station where she was. She also noted that the recreation room where the nurses or nurses' aids were sleeping was directly across from the nurses' station only a few feet away in plain view of the nurses' station. Ms. Patterson also confirmed that she was the only witness to the beating. Ms. Patterson testified that when she arrived and while she was there, there was a nurse at the nurses' station "watching call buttons." The personnel were there to be available if necessary and a nurse was alert to call buttons. This was not a hospital facility with personnel making rounds of sick patients. LSA-R.S. 40:2010.8A(8) mandates that nursing homes allow residents "closed room doors, and to have facility personnel knock before entering the room." There is nothing in the record to show that any higher level of care would be industry practice in this kind of facility and the trial court specifically found that Ms. Patterson's account of the incident was "credible and persuasive."
The majority states that: "[H]ad even one aide been awake and on the floor that morning, Ms. Guillory could have sought immediate help when she observed Mr. Harris with the pipe before the attack." The record does not support this contention. The only testimony concerning Ms. Guillory was given by Mr. Wilmore. Ms. Guillory did not testify. Mr. Wilmore was allowed to testify without objection as to the contents of a report he received on the incident from Ms. Guillory:
Q. What did Ms. Guillory state as reported?
A. She followed him with the pipe, followed behind him asking for him to *495 give her the pipe. He refused. It's not in here but she told us
* * * *
A. Well, in the document he refused to give it to her. And continued to run through the courtyard into the lobby and behind Mr. Banks at which time he hit him. [Emphasis added.]
Everything in the record indicates that the incident happened so quickly that there is no reason to believe that had the employees been awake that they could have reacted and gotten down the 75 foot hall in time to prevent Joseph Harris from striking Mr. Banks.
The majority states that: "The uncontroverted evidence indicates that Mr. Harris should have been checked every two hours." Mr. Wilmore testified that being a nursing home operator did not give him the right to restrain Mr. Harris to his room or to lock him in his room. Mr. Harris had the right to be up and walk around the nursing home before 5:00 a.m. if he wished to do so. Remember, Mr. Banks was also up and about before 5:00 a.m. that same morning and no one suggests that this called for any special supervision. Had someone noticed Mr. Harris up at that hour they would have had no duty to follow him around, and to do so without reason would arguably be an intrusion on his rights to privacy. No one patrols the halls and there is no evidence that the standard of care would require such patrols. Mr. Harris was not interdicted and he was not a prisoner stripped of certain rights. He was not in the custody of the nursing home and was free to leave whenever he wished. This is not an LSA-C.C.P. art. 2317 case. To suggest liability under that article would exceed any case in the existing jurisprudence and would almost certainly add ruinous insurance costs to nursing home care which would be very bad policy in our aging society. He was only a resident, not an inmate of a prison or a psychiatric facility. For Mr. Harris the nursing home was merely an apartment house or rooming house with a high level of service. Mr. Wilmore testified that Mr. Harris' condition was typical. Assume for purposes of argument that the nursing home had checked on Mr. Harris every two hours as majority opinion suggests should have been done, and checked on Mr. Harris at 4:00 a.m. and again at 6:00 a.m. on the morning of the incidentI still do not see how this would have prevented an incident that occurred in an instant around 5:00 a.m.
Mr. Wilmore further testified as follows:
Q. When the nurse's aids aren't doing rounds; what can they do? Can they be in the rec room?
A. Yes, they can.
Q. Where are they supposed to be?
A. They should be available for the nurse. If someone pushes one of those call buttons, and the nurse is there to answer the call and send the nurse's assistant to the room.
Q. How available are nurse's aids in the rec room?
A. The rec room, and I imagine the reason they were in there is because it is directly across from me to you form the nurse's station.
Q. So they were available? They were available there?
A. Yes.
Q. This rec room, is this in line of sight down that hall where the beating took place?
A. Not where the incident occurred, no.
Q. So, if somebody in the rec room would not necessarily be able to see what was going on all the way at the court? [Sic]

*496 A. No.
[Emphasis added.]
Thus, even had the nursing home employees been awake at their stations they could not have seen and prevented the incident. I would expect a very negative initial visceral reaction from anyone reviewing this record to the fact that some of the employees were asleep. However, in the instant case the plaintiffs have not borne their burden of proof to show that the sleeping employees were a cause in fact of the injuries sustained by Mr. Banks. In other words, assuming for purposes of argument that the failure of the employees of the nursing home to stay awake constituted a breach of duty to Mr. Banks, the plaintiffs still failed to prove by a preponderance of the evidence that the breach of that duty was a cause in fact of the decedent's injuries. In other words, the plaintiffs proved only the mere possibility of injury prevention. Plaintiffs did not, as they are required to do, prove the probability of such prevention.
This all goes to what I would characterize as a total misperception by the trial court as to the nature of the Maison Orleans nursing home facility as opposed to hospitals or psychiatric facilities. This misconception pervades the entire trial court opinion and is best exemplified by an unjustified and inappropriate reliance on the mental health case of Jones v. State through Dept. of Health and Hospitals, 95-1130 (La.App.3 Cir.3/27/96), 671 So.2d 1074. In Jones the forty-seven year old patient had a mental age of only three and four years and numerous other serious handicaps. The patient in Jones was required to be directly observed by his caretaker at all times, a level of supervision far beyond what Maison Orleans was expected to provide to Mr. Harris. The plaintiff in Jones was suing for the death of the patient for breach of the duty of care owed to the patient, not for damage caused by the patient to a third party. Moreover, the Pinecrest facility in Jones was obviously not a nursing home like the Maison Orleans. Mr. Wilmore testified without contradiction that Mr. Harris was not required to be under constant observation. A nursing home has no duty to furnish a nurse or attendant at all times. McCartney[1]v. Columbia Heights Nursing Home, Inc., 25,710 (La.App. 2 Cir.3/30/94), 634 So.2d 927; Oswald v. Rapides Iberia Management Enterprises, Inc., 452 So.2d 1258 (La.App. 2 Cir.1984); Cappo v. Alliance Ins. Co., 499 So.2d 233 (La.App. 2 Cir. 1986). The trial court in its reasons for judgment cited all of these cases, but in none of them was the nursing home held liable. These cases also point out that a nursing home is not an insurer of the safety of its patrons.
Mr. Wilmore explained that the Maison Orleans is not a hospital and is not required to make notations on patient charts concerning each observation and interaction with the patient. Mr. Wilmore's testimony is the only evidence in the record on this issue. Yet in spite of the only record evidence to the contrary, the trial court noted that "the nursing home had no system of record keeping to monitor whether or not this 24 hour supervision was being accomplished" implying that this was a breach of duty without any evidence to show that the standard of care in the industry required such record keeping. The record simply does not support the inference made by the trial court on this issue.
In Lemoine v. Insurance Company of North America, 499 So.2d 1004 (La.App. 3 Cir.1986), the court found that sexual abuse of an elderly nursing home resident *497 by an unknown assailant was not reported to any family member when first discovered by nursing home employees and that alleged instructions to all nursing home employees to be on the alert for any further indecent behavior were never delivered to any but a few employees. Numerous employees testified that they witnessed improprieties involving the elderly resident, but failed to report them. No investigation into the incidents was conducted until after they occurred for a third time. The failure to act in the face of repeated known acts of abuse in Lemoine involves facts so far removed from those of the instant case as to render Lemoine irrelevant as support for the trial court's decision below.
Similarly, the nursing home resident in Sayes v. Pilgrim Manor Nursing Home, Inc., 536 So.2d 705 (La.App. 3 Cir.1988), was retarded and had been admitted to the hospital sixteen times "because of violent, combative, destructive and suicidal behavior," where she was diagnosed as having chronic brain syndrome with psychotic reaction. Id., at p. 707. Her treating physician at the nursing home, Dr. Bahm, described her as emotionally labile with hostile reactions, or calm and cooperative one day and hostile and combative the next. Id. Dr. Bahm issued standing orders that his patient could be restrained for self-protection and the protection of others if she became violent. Dr. Bahm testified that she should not have been given the freedom to leave the nursing home at will, but she was, nevertheless, allowed to leave without even signing out. As a result she was frequently picked up by the Pineville police for causing a disturbance in the surrounding neighborhood. Her behavior on the days leading up to the incident that provoked the Sayes litigation was notably volatile, but she was still allowed to leave the premises unsupervised. In view of her known and long history of obvious problems the court found that the nursing home was negligent in treating her "like any other resident who had nominal physical or mental disabilities." This eminently reasonable result based on the egregious facts of the Sayes case has no bearing on the instant case where Mr. Harris had no history comparable to that of the nursing home resident in Sayes.
Just as in Sayes, supra, in Johnson v. Pendleton, 98-2001 (La.App. 4 Cir. 12/29/99), 751 So.2d 332, the violent nursing home resident had been diagnosed with psychotic symptoms. Moreover, shortly before attacking the nursing home employee-plaintiff by throwing her into a table resulting in the injuries responsible for the litigation, the nursing home resident was known to have committed several acts of violence. The nursing home was held liable because of its knowledge of the resident's dangerous propensities. In the instant case, unlike Sayes and Pendleton, there was no diagnosis of psychosis for Mr. Harris and no even remotely similar history of violence on his part.
Mr. Wilmore testified that there was video monitoring equipment in the hallways, but that it was illegal to monitor the residents in their rooms. No one watches the monitor during the 11 p.m.7 a.m. shift. Mr. Wilmore testified that the cameras were intended more to supervise employees than to monitor the activities of patients. This explains why the video monitor is in the administrator's office and not at any of the nurse or employee stations. The plaintiff made no showing that the standard for the industry required video monitoring of the residents. Mr. Wilmore explained that the video flicked randomly from camera to camera "for sixty something" and that it showed nothing relevant for that night. The trial court found that, "He testified ... that he *498 does not know where the tapes are at present," but this finding is contrary to the record. When asked: "Where are the tapes?", Mr. Wilmore replied: "At the home." Not only was this finding of fact manifestly erroneous, the trial court's finding that "the content captured on the tape must have been adverse to the positions advanced by the defendant" was consequently erroneous:
It is settled that when a litigant fails to produce available evidence and no reasonable explanation is made, there is a presumption that such evidence would be unfavorable. Boh Brothers Construction, 612 So.2d at 270; Wilson v. U.S. Fire and Casualty Company, 593 So.2d 695 (La.App. 4th Cir.1991), writ denied 597 So.2d 1037 (La.1992). To decide whether to apply the adverse inference, one is guided toward the goal of a fair and equitable judicial process, by the likelihood that the verdict will be based on truth, and by the need to deter the wrongful, intentional spoliation of evidence in the future. Kammerer v. Sewerage and Water Board of New Orleans, 93-1232 (La.App. 4 Cir. 3/15/94), 633 So.2d 1357, writ denied 94-0948 (La.7/1/94), 639 So.2d 1163.
Williams v. Golden, 95-2712 (La.App. 4 Cir. 7/23/97), 699 So.2d 102, 108.
The defendant did not fail to produce the tape in the instant case when called upon to do so. The plaintiffs do not even suggest that they ever asked to see the videotape. In Golden it was established that a doctor has the responsibility to preserve a patient's medical records, but the defendant-doctor was unable to explain what happened to the plaintiff's medical records:
Under these circumstances we are justified to apply an adverse inference and presume that Williams' records would have been unfavorable to Dr. Golden.
Id.
In Boh Bros., 612 So.2d 270 (La.App. 4 Cir.1992), cited in Golden, this Court was concerned with a defective "filter assembly unit" which the defendant had discarded. This Court found that it was error to instruct the jury that the failure of the plaintiff to preserve this critical piece of evidence created an adverse presumption without also instructing the jury that the presumption could be overcome by explaining the failure to produce the missing evidence. Consequently this Court conducted a de novo review without relying on any adverse presumptions, apparently finding satisfactory the defendant's explanation for why the allegedly defective part had been discarded. In Boh Bros. the missing evidence was the crux of the entire case, the part alleged to be defective, and the sole cause of the accident. This Court apparently accepted the explanation for its disappearance, that it was discarded in the normal course of maintenance prior to knowledge of the litigation. By comparison, in the instant case Mr. Wilmore testified without contradiction that the tape was still in existence at the home.
A survey of cases concerning this issue reveals that the presumption was intended to apply to evidence that was no longer in existence. There is usually an issue or at least an undercurrent of spoliation or the failure to produce evidence when requested to do so, none of which apply to the instant case. Even when the evidence has been disposed of, any reasonable explanation for the disposal serves to defeat the presumption. Rapp v. City of New Orleans, 98-1714 (La.App. 4 Cir. 12/29/99), 750 So.2d 1130;[2]Small v. Baloise Ins. Co. of America, 96-2484 (La.App. 4 Cir. *499 3/18/98), 753 So.2d 234, 242; Randolph v. General Motors Corp., 93-1983 (La.App. 1 Cir. 11/10/94), 646 So.2d 1019, 1027; Wimberly v. B.P. Newman Investments, Inc., 34,905 (La.App. 2 Cir. 11/2/01), 805 So.2d 239, 246; Smith v. Jitney Jungle of America, 35,100 (La.App. 2 Cir. 12/5/01), 802 So.2d 988, writ denied XXXX-XXXX (La.3/15/02), 811 So.2d 913; All Seasons Const. v. City of Shreveport, 32,190 (La. App. 2 Cir. 8/18/99), 742 So.2d 626, 635; Johnson v. Department of Public Safety, 627 So.2d 732 (La.App. 2 Cir.1993); Edwards v. Daugherty, 97-1542 (La.App. 3 Cir. 3/10/99), 729 So.2d 1112, 1131-1132; Hooker v. Super Products Corp., 98-1107 (La.App. 5 Cir. 6/30/99), 751 So.2d 889, 910.
In Wimberly, supra, p. 9, 805 So.2d at 246, the court held the failure to produce a videotape that did not contain "vital real evidence" did not create an adverse presumption. As this Court explained in Constans v. Choctaw Transport, Inc., 97-0863 (La.App. 4 Cir. 12/23/97), 712 So.2d 885:
The cases cited by Allstate indicate apply [sic] the adverse presumption rule should only apply to situations in which the evidence was destroyed or discarded with no remaining photographs under conditions from which one could infer that the party disposing of the evidence was motivated by a desire to dispose of unfavorable evidence. There is nothing in the way that Choctaw dealt with this bumper from which we might infer that the disposition of the bumper was motivated by a desire to deprive other litigants of access to it. The theory of spoliation of evidence refers to an intentional destruction of the evidence for the purpose of depriving the opposing party of its use.
Id.
In the instant case there is no suggestion that Maison Orleans made any attempt to conceal or destroy the videotape. There is no suggestion Maison Orleans resisted any request to produce the tape. Mr. Wilmore admitted without hesitation that the tape existed, but when he did so the plaintiffs made no request that it be produced. There are no cases even remotely approaching the fact situation of the instant case in which the adverse presumption was found to be applicable. Mr. Wilmore explained that because of the random nature of the tapes they showed nothing of probative value, i.e., the fact that the tapes showed nothing of the incident would either tend to prove or disprove the Maison Orleans' case because the entire incident and everything leading up to it could have easily occurred off camera. If the plaintiffs felt that the tape might have contained evidence helpful to their case, they should have requested that it be produced either through prior discovery or by asking that it be produced on the spot and/or asking that the receipt of evidence be held open pending the production of the tape. After all, there was no jury to inconvenience by holding open the evidence. Plaintiffs failed to take any steps in this regard. It was error for the trial court to apply an adverse presumption against the Maison Orleans under the facts of this case.
Mr. Wilmore testified that a resident who displayed violent tendencies would not be allowed to stay. The Maison Orleans is a residential facility, not a psychiatric facility.
The first witness called by the plaintiffs was, Marquitta Patterson. At the time of the incident, Ms. Patterson was a Phelbotomist for Smith Kline Beecham Clinical Laboratories. Her work required her to be at the Maison Orleans Nursing Home four or five days a week. She was the only witness to the incident, which she described as follows:

*500 I passed Mr. Banks through the recreation area. It's like a living room like. So, I passed him up that morning and as I proceeded to go down the hallway, I took a right down the hallway to the nurses station. I stood there for about 5 to 6 minutes, sorted out my paper work. As I started sorting out my paper work, I heard like a bump against the wall. After I heard the bump, I never paid it any attention. So, I just continued to sort my paper work. I heard the bump again like a wheelchair. You know, like something had fallen against the wall. I said, well, I still have to go back that way, so, just let me get my tray and I'll start out this end so I could see what it was. So, as I approached the hallway, it was Mr. Banks being beaten by one of the other residents. As I approached him, I seen like a hand come from the side of the wall and I screamed. Once I screamed the guy hit him maybe two or three more times after I screamed. And he walked away saying, "He should have cleaned my sheets." And that was it. But after I screamed I woke up everybody, because everybody was asleep except for myself and the nurse at the nurse's station.
The trial court did not find, and, indeed, the record does not reasonably permit one to infer that had some of the sleeping employees been awake at the time Ms. Patterson screamed, that they could have rushed to Mr. Bank's assistance fast enough to prevent the battery which was already in progress.
The trial court enumerated four negligent acts in support of its conclusion, but the first example described by the trial court following its four-fold enumeration of negligence is clearly wrong as a basis for the result reached by the trial court:
The Maison Orleans II, Inc.'s documents pertaining to Banks establish that they were aware of Harris abnormal behavior prior to the February 16, 1993 [sic] in their final notation with respect to Banks prior to this incident that on: "1/14/93, Banks continues his daily routine such as delivery of newspapers. He also enjoys standing in the hall communicating with others and watching what goes on."
The fact that Mr. Banks enjoyed standing in the hall and communicating with others provides no information to Maison Orleans II that would alert it to Mr. Harris' potential for inflicting harm upon Mr. Banks.
The entire trial court opinion is permeated with unsupported assumptions that Mr. Harris's dementia, organic brain syndrome and delusional thought were indicative of violent behavior when all of the evidence is to the contrary. As there is simply no evidence that Mr. Harris' symptoms were indicative of violent propensities, the trial court, in effect, took upon itself the role of psychiatric expert; a role that court is not qualified to take upon itself when contrary to the evidence. Had there been conflicting evidence on this issue, normally the trial court would have the prerogative of choosing which evidence to credit. But there was no conflicting evidence. The plaintiffs produced no witness who testified as to any prior incident with Mr. Harris and there was no prior diagnosis of psychosis such as supported the findings of liability in Sayes and Pendleton, supra. Implicit throughout the trial court's reasons is the erroneous conclusion that Mr. Harris was a known psychotic and that the nursing home should have acted accordingly. I find no cases even remotely resembling the facts of the instant case in which a nursing home has been held liable. The *501 plaintiffs cite no such cases and the trial court in its reasons cite none.
I would assign all of the fault to Mr. Harris who was not an interdict at the time of the incident.
For the foregoing reasons, I would reverse the opinion of the trial court and find in favor of the defendants. However, were I to agree for purposes of argument that the Maison Orleans is liable, then I would agree with the majority on the issue of insurance coverage.
JONES, J., CONCURRING IN PART; DISSENTING IN PART.
While I concur with the majority as to the amount of damages awarded to the family of Lawrence Banks, I do not agree with the allocation of fault distributed between Mr. Harris and Maison Orleans. I further respectfully dissent in the majority's limitation of liability on Scottsdale Insurance Company.
McKAY, J., CONCURRING IN PART AND DISSENTING IN PART WITH REASONS.
I concur with the majority opinion in all respects except with its decision to assess Joseph Harris with 25% of the liability. From that portion of the opinion, I respectfully dissent.
Joseph Harris suffered from organic brain syndrome and was unable to care for himself or his needs. Mr. Harris was also known to "preach" to walls and talk to nonexistent people. Clearly, the capacities of Mr. Harris were inferior as envisioned by the Supreme Court in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). Furthermore, Mr. Harris was in the care and custody of Maison Orleans. As we know from Louisiana Civil Code Article 2317, "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things in our custody." Accordingly, for these reasons, I respectfully dissent from the majority's decision to assess Joseph Harris with 25% of the liability.
NOTES
[1] Although the trial court's reasons for judgment state that "Richoux stated that violent behavior is typical for organic brain syndrome," a review of the record fails to support this statement. In fact, Dr. Richoux stated the exact opposite: violent behavior is not usually associated with organic brain syndrome.
[2] Dr. Richoux explained that Hydergine is a medication that is no longer prescribed, but that was thought in the late 1980's and early 1990's to have some ability to restore intellectual functions in individuals with Organic Brain Syndrome. Dr. Richoux recommended that Mr. Harris cease taking Hydergine because he never saw any of his patients benefit from it while he was the director of the Geriatric Unit at DePaul Hospital.

Dr. Richoux described Ativan as an antianxiety agent that "can also be used for sleep given at somewhat higher doses." Upon examination, he recommended that Mr. Harris continue taking low doses of Ativan. When asked what would happen if Mr. Harris would become violent if he stopped taking the Ativan, Dr. Richoux testified that Ativan "has no specificity for preventing violent behavior" and is not used as an anti-aggression medication. Dr. Richoux saw no reason to prescribe an anti-aggression drug.
[3] Although Ms. Guillory did not testify, her statement was introduced into evidence as part of Mr. Harris' medical records from Maison Orleans and is properly before this court for consideration.
[4] The plaintiffs cause of action arose during the period of time that Veazey v. Elmwood Plantation Associates, Ltd., 93-2828 (La.11/30/94), 650 So.2d 712, was applicable law. Without citing Veazey, the Supreme Court's decision in Wallmuth essentially reaffirmed the Court's earlier decision in Veazey.
[5] La. C.C. art. 2315.2 provides in pertinent part:

A. If a person dies due to the fault of another, suit may be brought by the following persons to recover damages which they sustained as a result of the death:
1. The surviving spouse and child or children of the deceased, or either the spouse of the child or children ...
[1] Referred to erroneously by the trial court as McGillivray.
[2] Where the defendant failed to produce requested evidence.